# PUERTO RICO *v.* BRANSTAD, GOVERNOR OF IOWA, ET AL.

No. 85–2116.   Argued March 30, 1987—Decided June 23, 1987

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined, in Parts I, II–A, II–C, and III of which POWELL and O'CONNOR, JJ., joined, and in which SCALIA, J., joined in part. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which POWELL, J., joined, *post*, p. 230. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 231.

*Lino J. Saldana* argued the cause for petitioner. With him on the brief were *Hector Rivera Cruz*, Secretary of Justice of Puerto Rico, *Rafael Ortiz Carrion*, Solicitor General, and *Susan Estrich* and *Kathleen M. Sullivan*.

*Brent R. Appel* argued the cause for respondents. With him on the brief were *Thomas J. Miller*, Attorney General of Iowa, *Roxann Ryan* and *Pamela Greenman Dahl*, Assistant Attorneys General, and *William L. Kutmus*.

JUSTICE MARSHALL delivered the opinion of the Court.

This case requires that we reconsider the holding of *Kentucky* v. *Dennison*, 24 How. 66 (1861), that federal courts

have no power to order the Governor of a State to fulfill the State's obligation under the Extradition Clause of the Constitution, Art. IV, § 2, to deliver up fugitives from justice.

## I

On January 25, 1981, respondent Ronald Calder, then a civilian air traffic controller employed by the Federal Aviation Administration in San Juan, Puerto Rico, struck two people with his automobile. One of the victims, Antonio de Jesus Gonzalez, was injured; his wife, Army Villalba, was killed. Villalba was eight months pregnant; her unborn child did not survive. App. 3a. The incident occurred in the parking lot of a grocery store in Aguadilla, Puerto Rico, after what was apparently an altercation between Calder and De Jesus Gonzalez. According to two sworn statements taken by police, one from De Jesus Gonzalez and one from a witness to the incident, after striking the couple Calder backed his car two or three times over the prostrate body of Villalba. App. to Pet for Cert. A34–A41.

On the basis of these statements, Calder was arrested, charged with homicide, arraigned before a municipal judge, and released on $5,000 bail. On February 4, 1981, Calder was arraigned before a District Court of the Commonwealth of Puerto Rico, charged with first-degree murder and attempted murder. Calder failed to appear at a preliminary hearing on March 4, 1981, and bail was increased to $50,000. Despite representations by counsel that Calder would appear at a preliminary hearing on April 13, 1981, he did not do so. At that time Calder was declared a fugitive from justice, and bail was increased to $300,000. The Puerto Rican police, having reason to believe that Calder had left Puerto Rico and returned to his family's home in Iowa, notified local authorities in Iowa that Calder was a fugitive wanted in Puerto Rico on murder charges. On April 24, 1981, Calder surrendered

to local authorities in Polk County, Iowa, posted the $20,000 bond set by an Iowa Magistrate, and was released. *Id.*, at A18–A19.

On May 15, 1981, the Governor of Puerto Rico submitted to the Governor of Iowa a request for Calder's extradition. The requesting papers included the arrest warrant, the fugitive resolution, the charging documents, and three sworn statements of witnesses, including one in which the affiant identified a photograph of Calder as depicting the driver of the car. Counsel for Calder requested that the Governor of Iowa hold an extradition hearing, which was conducted by the Governor's counsel on June 17, 1981. *Id.*, at A19. This hearing was only partially transcribed, but the record does show that one of Calder's counsel was permitted to testify to his belief that "a white American man . . . could not receive a fair trial in the Commonwealth of Puerto Rico," App. 32a, while Calder himself testified to his understanding that "on numerous occasions" witnesses in Puerto Rican courts had been "bought." *Id.*, at 47a.

After the extradition hearing in Iowa, discussions between and among Calder's counsel, the Governors of Iowa and Puerto Rico, and the prosecutorial authorities in Puerto Rico were held, apparently with a view to negotiating a reduction of the charges lodged against Calder. These discussions were unavailing, and on December 28, 1981, Iowa's Governor, Robert Ray, formally notified the Governor of Puerto Rico that in the absence of a "change to a more realistic charge," the request for extradition was denied. App. to Pet. for Cert. A44. A subsequent extradition request made to Governor Ray's successor in office, respondent Terry Branstad, was also denied. *Id.*, at A21.

On February 15, 1984, petitioner Commonwealth of Puerto Rico filed a complaint in the United States District Court for the Southern District of Iowa against respondents Governor

Branstad and the State of Iowa,[1] seeking a declaration that failure to deliver Calder upon presentation of proper extradition papers violated the Extradition Clause and the Extradition Act, 18 U. S. C. § 3182 (Act).[2] The complaint further requested the issuance of a writ of mandamus directing respondent Branstad to perform the "ministerial duty" of extradition. App. 7a–8a. Respondents stipulated before the District Court that the extradition papers fully complied with the requirements of the Act. App. to Pet. for Cert. A20. The District Court dismissed the complaint, agreeing with respondents that this Court's holding in *Kentucky* v. *Dennison*, 24 How. 66 (1861), absolutely barred any attempt to invoke federal judicial authority to compel compliance with the Clause or the Act. Civil No. 84–126–E (SD Iowa, May 22, 1985), App. to Pet. for Cert. A10. The Court of Appeals "[r]eluctantly" affirmed. 787 F. 2d 423, 424 (CA8 1986).

---

[1] Petitioner had previously sought to file a bill of complaint in this Court, under our original jurisdiction. Motion for leave to file the bill was denied. *Puerto Rico* v. *Iowa*, 464 U. S. 1034 (1984).

[2] Section 3182 provides:

"Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged."

The statute has remained substantially unchanged since its original enactment in the Extradition Act of 1793, 1 Stat. 302. See also 18 U. S. C. § 662 (1940 ed.); Rev. Stat. § 5278.

We granted certiorari, 479 U. S. 811 (1986), to consider whether the propositions concerning the limitation of federal judicial power stated in *Kentucky* v. *Dennison* in 1861 retain their validity today. We reverse.

## II

### A

*Kentucky* v. *Dennison* was an action brought under this Court's original jurisdiction to compel by writ of mandamus the extradition of a fugitive felon. The grand jury of Woodford County, Kentucky, returned an indictment in October 1859 charging Willis Lago, a "free man of color," with the crime of assisting the escape of a slave. 24 How., at 67. The defendant was a resident of Ohio, and papers requesting his extradition were served upon William Dennison, the Governor of that State. Dennison secured an opinion from Ohio's Attorney General, who took the view that the Extradition Clause[3] covered only those acts which were crimes under the law of the asylum State, or which were "regarded as *malum in se* by the general judgment and conscience of civilized nations." *Id.*, at 69.[4] On this basis Dennison refused extradition, and Kentucky brought its mandamus action in this Court.

The case was heard in February 1861, and decided on March 14. On that date secession was a fact, and civil war a threatening possibility. The Representatives of the States

---

[3] "A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime." Art. IV, § 2, cl. 2.

[4] This interpretation of the Extradition Clause was frequently invoked in the antebellum period by Governors of free States requested to extradite those who had assisted the escape of slaves. It was initially stated by Governor Seward of New York in 1841. See 2 Works of William H. Seward 502–509 (G. Baker ed. 1853); see generally 5 C. Swisher, History of the Supreme Court of the United States: The Taney Period 677–685 (1974).

of the Deep South had withdrawn from the Congress. Justice Campbell was reputedly engaged in mediation efforts between the seceding States and the Lincoln administration, but his resignation from the Court and departure from Washington were imminent; he resigned on April 30, 1861. See 5 C. Swisher, History of the Supreme Court of the United States: The Taney Period 688–689 (1974). It was in these circumstances, with the practical power of the Federal Government at its lowest ebb since the adoption of the Constitution, that Chief Justice Taney delivered the opinion of the Court.

The Court firmly rejected the position taken by Dennison and the Governors of other free States that the Extradition Clause required only the delivery of fugitives charged with acts which would be criminal by the law of the asylum State. "Under such a vague and indefinite construction," the Court said, "the article would not be a bond of peace and union, but a constant source of controversy and irritating discussion." 24 How., at 102. Interpreting for the first time the language of the Clause, the Court looked to the fundamental role of the right to request extradition in binding the individual States into a nation:

> "Looking, therefore, to the words of the Constitution—to the obvious policy and necessity of this provision to preserve harmony between States, and order and law within their respective borders . . . —the conclusion is irresistible, that this compact engrafted in the Constitution included, and was intended to include, every offence made punishable by the law of the State in which it was committed, and that it gives the right to the Executive authority of the State to demand the fugitive from the Executive authority of the State in which he is found; that the right given to 'demand' implies that it is an absolute right; and it follows that there must be a correlative obligation to deliver, without any reference to the character of the crime charged, or to the policy or laws of the State to which the fugitive has fled." *Id.*, at 103.

The Court then turned to the Extradition Act of 1793, 1 Stat. 302. In the procedures for the regulation of extradition established by that Act, the Court found the same absolute right to demand and correlative obligation to deliver. As to the Governor of the asylum State under the Act, the Court determined that "[t]he duty which he is to perform is . . . merely ministerial—that is, to cause the party to be arrested, and delivered to the agent or authority of the State where the crime was committed." 24 How., at 106. But the Court concluded that "the words 'it shall be the duty' were not used as mandatory and compulsory, but as declaratory of the moral duty" created by the Constitution. *Id.*, at 107. Such a construction was necessary, in the Court's view, to avoid constitutional infirmity.

> "The act does not provide any means to compel the execution of this duty, nor inflict any punishment for neglect or refusal on the part of the Executive of the State; nor is there any clause or provision in the Constitution which arms the Government of the United States with this power. Indeed, such a power would place every State under the control and dominion of the General Government, even in the administration of its internal concerns and reserved rights. And we think it clear, that the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it." *Ibid.*

## B

Thus, for over 125 years, *Kentucky* v. *Dennison* has stood for two propositions: first, that the Extradition Clause creates a mandatory duty to deliver up fugitives upon proper demand; and second, that the federal courts have no authority under the Constitution to compel performance of this ministerial duty of delivery. As to the first of these conclusions, the passage of time has revealed no occasion for doubt. The language of the Clause is "clear and explicit." *Michigan* v.

*Doran,* 439 U. S. 282, 286 (1978). Its mandatory language furthers its intended purposes: "to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed," and "to preclude any state from becoming a sanctuary for fugitives from justice of another state." *Id.,* at 287; see *Biddinger* v. *Commissioner of Police,* 245 U. S. 128, 132–133 (1917); *Appleyard* v. *Massachusetts,* 203 U. S. 222, 227 (1906). The Framers of the Constitution perceived that the frustration of these objectives would create a serious impediment to national unity, and the Extradition Clause responds to that perception. "It would have been far better to omit it altogether, and to have left it to the comity of the States, and their own sense of their respective interests, than to have inserted it as conferring a right, and yet defining that right so loosely as to make it a never-failing subject of dispute and ill-will." *Kentucky* v. *Dennison,* 24 How., at 102. We reaffirm the conclusion that the commands of the Extradition Clause are mandatory, and afford no discretion to the executive officers or courts of the asylum State. See *California* v. *Superior Court of California,* 482 U. S. 400, 405–406 (1987).

The second, and dispositive, holding of *Kentucky* v. *Dennison* rests upon a foundation with which time and the currents of constitutional change have dealt much less favorably. If it seemed clear to the Court in 1861, facing the looming shadow of a Civil War, that "the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it," 24 How., at 107, basic constitutional principles now point as clearly the other way. Within 15 years of the decision in *Dennison* it was said that "when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a *mandamus* to compel its performance," and it was no objection that such an order might be sought in the federal courts against a state officer. *Board of Liquidation* v. *McComb,* 92 U. S. 531, 541 (1876).

It has long been a settled principle that federal courts may enjoin unconstitutional action by state officials. See *Ex parte Young*, 209 U. S. 123, 155–156 (1908). It would be superfluous to restate all the occasions on which this Court has imposed upon state officials a duty to obey the requirements of the Constitution, or compelled the performance of such duties; it may suffice to refer to *Brown* v. *Board of Education*, 349 U. S. 294 (1955), and *Cooper* v. *Aaron*, 358 U. S. 1 (1958). The fundamental premise of the holding in *Dennison*—"that the States and the Federal Government in all circumstances must be viewed as coequal sovereigns—is not representative of the law today." *FERC* v. *Mississippi*, 456 U. S. 742, 761 (1982).

Yet, with respect to extradition, the law has remained as it was more than a century ago. Considered *de novo*, there is no justification for distinguishing the duty to deliver fugitives from the many other species of constitutional duty enforceable in the federal courts. Indeed the nature of the obligation here is such as to avoid many of the problems with which federal courts must cope in other circumstances. That this is a ministerial duty precludes conflict with essentially discretionary elements of state governance, and eliminates the need for continuing federal supervision of state functions. The explicit and long-settled nature of the command, contained in a constitutional provision and a statute substantially unchanged for 200 years, eliminates the possibility that state officers will be subjected to inconsistent direction. Because the duty is directly imposed upon the States by the Constitution itself, there can be no need to weigh the performance of the federal obligation against the powers reserved to the States under the Tenth Amendment.

Respondents contend, however, that an "executive common law" of extradition has developed through the efforts of Governors to employ the discretion accorded them under *Dennison*, and that this "common law" provides a superior alternative to the "ministerial duty" to extradite provided for by the Constitution. Tr. of Oral Arg. 21. Even assum-

ing the existence of this tradition of "executive common law," no weight can be accorded to it. Long continuation of decisional law or administrative practice incompatible with the requirements of the Constitution cannot overcome our responsibility to enforce those requirements. See, *e. g.,* *Brown* v. *Board of Education,* 347 U. S. 483 (1954); *Green* v. *New Kent County School Board,* 391 U. S. 430 (1968). Though not articulated in these terms, respondents' argument is in essence a request that we reconsider our construction of the Extradition Clause to establish as a matter of constitutional interpretation a discretion which has hitherto been exercised solely because the Constitution's explicit command has gone unenforced. This, for the reasons previously stated, we decline to do.

C

Respondents further contend that even if the holding in *Kentucky* v. *Dennison* cannot withstand contemporary scrutiny, petitioner would not profit from its demise because Puerto Rico is not a State, and has no right to demand rendition of fugitives under the Extradition Clause. It is true that the words of the Clause apply only to "States," and we have never held that the Commonwealth of Puerto Rico is entitled to all the benefits conferred upon the States under the Constitution. We need not decide today what applicability the Extradition Clause may have to the Commonwealth of Puerto Rico, however, for the Extradition Act clearly applies. The Act requires rendition of fugitives at the request of a demanding "Territory," as well as State. It was decided long ago that Puerto Rico, as a Territory of the United States, could invoke the Act to reclaim fugitives from its justice, see *New York ex rel. Kopel* v. *Bingham,* 211 U. S. 468 (1909), and respondents do not challenge the correctness of that holding. The subsequent change to Commonwealth status through legislation, see 64 Stat. 319, 48 U. S. C. §§ 731b–731d, did not remove from the Government of the Commonwealth any power to demand extradition which it had possessed as a Territory, for the intention of that legislation

was "to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union." *Examining Board of Engineers, Architects and Surveyors* v. *Flores de Otero*, 426 U. S. 572, 594 (1976). Since the Act applies to Puerto Rico, the Commonwealth may invoke the power of federal courts to enforce against state officers rights created by federal statutes, including equitable relief to compel performance of federal statutory duties. See *Maine* v. *Thiboutot*, 448 U. S. 1 (1980). Accordingly, Puerto Rico may predicate its mandamus action on the Act, without regard to the direct applicability of the Extradition Clause.[5]

### III

*Kentucky* v. *Dennison* is the product of another time. The conception of the relation between the States and the Federal Government there announced is fundamentally incompatible with more than a century of constitutional development. Yet this decision has stood while the world of which it was a part has passed away. We conclude that it may stand no longer. The decision of the Court of Appeals is

*Reversed.*

JUSTICE O'CONNOR, with whom JUSTICE POWELL joins, concurring in part and concurring in the judgment.

I join Parts I, II–A, II–C, and III of the Court's opinion. Because the Court ultimately resolves this case under the

---

[5] Respondents contend: "Puerto Rico seeks to force the states to honor its rendition requests even though Congressional representatives of the states have not had an opportunity to consider the admission of Puerto Rico as a state into the Union . . . . Puerto Rico's argument . . . serves to eviscerate the significance of the statehood admissions process." Brief for Respondents 22. Leaving aside the fact that Congress enacted the legislation which made Puerto Rico first a Territory and then a Commonwealth, this curious logic would suggest that Iowa is not required to extradite felons to States, such as New York and Massachusetts, whose presence in the Union is not attributable to votes cast in Congress.

Extradition Act, 18 U. S. C. § 3182, I do not find Part II–B, and its statements concerning the Extradition Clause of the Constitution, necessary to the decision of this case. Accordingly, I do not subscribe to that part of the Court's opinion. See, *e. g., Jean* v. *Nelson,* 472 U. S. 846, 854 (1985); *Kolender* v. *Lawson,* 461 U. S. 352, 361, n. 10 (1983); *Ashwander* v. *TVA,* 297 U. S. 288, 347 (1936) (Brandeis, J., concurring).

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I concur in the result, and in the portions of the Court's opinion applying 18 U. S. C. § 3182 and overruling *Kentucky* v. *Dennison,* 24 How. 66 (1861), insofar as it interpreted the predecessor of that statute. I note that no party before us has asserted the lack of power of Congress to require extradition from a State to a Territory.