STATE OF ALABAMA, ex rel. its GOV-
ERNOR AND its ATTORNEY GEN-
ERAL, Plaintiff–Appellant,

v.

John M. ENGLER, in his official capaci-
ty as Governor of the State of Michi-
gan, Defendant–Appellee,

Phillip Chance, Movant–Appellee.

No. 94–2436.

United States Court of Appeals,
Sixth Circuit.

Argued March 11, 1996.

Decided June 12, 1996.

Robert S. Harrison (briefed), Harrison & Zacks, Bloomfield Hills, MI, for James E. Folsom, Jr. and James H. Evans.

Paul M. Newcomer (argued), Robert S. Harrison, Harrison & Zacks, Bloomfield Hills, MI, for State of Alabama.

Robert Ianni (argued and briefed), Office of the Attorney General of Michigan, Lansing, MI, for John M. Engler.

James Schuster, Southfield, MI, for Phillip Chance.

Before: JONES, BOGGS, and BATCHELDER, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which BATCHELDER, J., joined. JONES, J. (pp. 1210–11), delivered a separate concurring opinion.

BOGGS, Circuit Judge.

The State of Alabama seeks a writ of mandamus compelling the Governor of Michigan, John M. Engler, to extradite an escaped felon, Phillip Chance, who has been living in Michigan under a gubernatorial grant of "asylum" for the last fourteen years. In the district court, Engler successfully defended the action by arguing that the grant of "asylum," however erroneous, was a final state determination of the merits of Chance's case, and therefore deserves full faith and credit. For the reasons that follow, we disagree and reverse. Article IV, § 2, cl. 2 of the Constitution, as recently interpreted by the Supreme Court in *Puerto Rico v. Branstad*, 483 U.S. 219, 107 S.Ct. 2802, 97 L.Ed.2d 187 (1987), requires that Governor Engler return Chance to Alabama.

**I**

The Circuit Court of Choctaw County, Alabama, convicted Phillip Chance of murder on April 30, 1973. After serving over eight years of a life sentence, Chance escaped from prison and fled to Michigan, the state of his birth. One year after the escape, in June 1982, Alabama Governor Forrest H. James, Jr., made a formal request to Michigan under the Uniform Criminal Extradition Act, 18

U.S.C. § 3182, for the extradition of Chance. In response to this request, Michigan Governor William G. Milliken held an "Extradition Hearing" on September 22, 1982. Governor Milliken then granted Chance "asylum" from Alabama because of Chance's "very fine character" and "the support of family and friends." Letter, Governor Milliken to Governor James, October 5, 1982.

Alabama unsuccessfully asked Governor Milliken to reconsider his opinion in November 1982. Letter, Attorney General Charles A. Graddick to Governor Milliken, November 8, 1982. Alabama reminded Governor Milliken of "the language of the Extradition Clause" and the fact that Chance "remains a convicted felon." *Ibid.* Governor Milliken nevertheless refused. When Governor Milliken's term expired, Alabama tried its luck with his successor, James J. Blanchard, in May 1984. Finding "no new evidence which would convince one that Governor Milliken's decision should be altered," Governor Blanchard denied Alabama's request. Letter, Governor Blanchard to Governor George C. Wallace, January 12, 1984.

Chance has spent the last fourteen years at liberty in Michigan. Alabama, however, has continued to report him as a fugitive on the list of wanted persons kept by the National Criminal Information Center (NCIC). At least ten times since his escape, local police in Michigan have stopped Chance, and then arrested him, at least in part, because of the NCIC listing. After each arrest, the police contacted the Alabama Department of Corrections. The Department of Corrections informed the local police of Chance's status, and Alabama's continuing desire for extradition. On each occasion, however, the local police simply released Chance.

The last such arrest occurred on October 19, 1993. After it learned of the subsequent release, Alabama made its fourth formal request to Michigan for extradition. Governor John M. Engler denied the request. Perhaps encouraged by the Supreme Court's 1987 *Branstad* decision, discussed below, Alabama filed this action for a declaratory judgment and a writ of mandamus.

In the proceedings below, Governor Engler conceded that, because of *Branstad,* a federal court has the power to enforce the constitutional duty to extradite a fugitive. Governor Engler also conceded that a Governor has no power to refuse to extradite a fugitive based on the merits of the fugitive's case. *See Branstad,* 483 U.S. at 225, 107 S.Ct. at 2807 (quoting *Kentucky v. Dennison,* 65 U.S. (24 How.) 66, 103, 16 L.Ed. 717 (1861) (Governor has duty to extradite "without any reference to the character of the crime charged, or to the policy or laws of the State to which the fugitive has fled.")). Instead, Governor Engler's defense rested on two contentions.[1] First, the Full Faith and Credit Clause of the Constitution requires Alabama to respect Governor Milliken's grant of asylum to Chance. Second, the power of federal courts to enforce the Extradition Clause under *Branstad* is "a new rule" under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and should not apply retroactively to "divest an individual ... of the liberty and freedom he enjoyed based upon his reliance" on earlier precedent. Order, December 6, 1994, at 5.

The district court held that Governor Milliken's decision to grant Chance "asylum" in 1982 was "technically unconstitutional." However, the court agreed with Governor Engler that Alabama must give Governor Milliken's unconstitutional decision Full Faith and Credit. Order at 9–12. The district court also agreed that *Branstad* announced a new rule under *Teague,* and that the new rule could not be used to collaterally attack a "final state determination" that Chance deserved asylum. Order at 16–17. As a result, the district court issued a peculiar order—one that mirrors the state of the law of extradition in 1861, as discussed below. It granted Alabama's request for a declaratory judgment that Engler was constitutionally obligated to return Chance, but it "decline[d] to obligate [Engler] to extradite

---

1. Engler also argued that Alabama's request is barred by the doctrine of laches because Alabama waited too long before making the 1993 request, but Engler does not appeal the district court's rejection of his laches defense.

him." Order at 22. Alabama filed a timely notice of appeal.

## II

The United States Constitution imposes on the Governor of each state a duty to surrender any fugitive from the justice of another state to that state upon proper request. That duty is embodied in Article IV of the Constitution and in the Extradition Act of 1793, now codified at 18 U.S.C. § 3182. Until 1987, the courts of the United States were without jurisdiction to enforce the Extradition Clause because of the Supreme Court's 1861 opinion in *Kentucky v. Dennison*, decided on the eve of the Civil War. 65 U.S. (24 How.) 66 (although duty to extradite is mandatory, federal court cannot force state governor to extradite). In 1987, the Supreme Court abandoned this restriction on federal jurisdiction as an anachronism. *Branstad*, 483 U.S. at 228, 107 S.Ct. at 2808 ("[T]here is no justification for distinguishing the duty to deliver fugitives from the many other species of constitutional duty enforceable in federal courts.").

■■■ Alabama argues that the district court erred by focusing on the 1982 decision by Governor Milliken to grant Chance "asylum." We agree. The relevant issue is whether the Constitution allows Governor *Engler* to refuse extradition *now*. The answer is clearly no. There are only four possible grounds for refusing to extradite a person: (a) the extradition documents facially are not in order; (b) the person has not been charged with a crime in the requesting state; (c) the person is not the person named in the extradition documents; and (d) the person is not a fugitive. *California v. Superior Court*, 482 U.S. 400, 407, 107 S.Ct. 2433, 2438, 96 L.Ed.2d 332 (1987). Governor Engler has not raised any of these objections, and the writ must be granted.

■■■ Even the question of whether the requesting state is bound by the Full Faith and Credit Clause or barred by *Teague v. Lane* should be raised in the courts of the requesting state—not decided by the Governor of the state to which the fugitive has fled. *Cf. Strachan v. Colon*, 941 F.2d 128, 131–32 (2d Cir.1991) (defense of laches, no matter how compelling, was not a defense to extradition, but rather a matter for the courts of the requesting state to consider on their own). In fact, we are at a loss to find *any* basis for the district court's subject matter jurisdiction to decide the defenses raised by Governor Engler and Chance, who intervened in this action. The defenses are not relevant to the federal question of whether the extradition of Chance is required by the Extradition Clause or the Act, because the claims are not valid defenses to a request for extradition. The Declaratory Judgment Act is no help to Chance because he cannot seek a declaration that he has a constitutional defense to a pending state prosecution or re-prosecution. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Finally, we could not even construe Chance's intervention as some sort of petition for habeas corpus relief against Alabama, because Chance is not yet in Alabama's custody. 28 U.S.C. § 2254(a); *Garlotte v. Fordice*, —— U.S. ——, ——, 115 S.Ct. 1948, 1951, 132 L.Ed.2d 36 (1995).

## III

Moreover, it is not necessary to rest a reversal of the district court's denial of a writ of mandamus solely on the court's lack of subject matter jurisdiction. Governor Engler's defenses are wholly without merit.

■■■ First, the district court held that Alabama must defer to Governor Milliken's decision because that decision was a "public act" for the purposes of the Full Faith and Credit Clause. Even assuming that the Governor's decision was a "public act" in the face of *Carroll v. Lanza*, 349 U.S. 408, 411, 75 S.Ct. 804, 806, 99 L.Ed. 1183 (1955) ("public act" refers to a statute), it was a public act that Michigan *was expressly forbidden from performing*. *Kentucky v. Dennison*, 65 U.S. at 103. A state adjudication—whether by court or governor—merits no full faith and credit if entered wholly without jurisdiction. Such a decision is void from the inception, and other courts must treat it as the legal nullity it is. *Hooks v. Hooks*, 771 F.2d 935, 950 (6th Cir.1985).

██ Chase argues in his brief that Governor Milliken's *determination that he had jurisdiction* is entitled to full faith and credit, as well as the governor's resolution of the merits of the extradition request. Chance cites *Treinies v. Sunshine Mining Co.*, 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85 (1939) (Washington state court bound by Idaho court's erroneous holding that Idaho court had subject matter jurisdiction to decide an issue of Washington law). *Treinies* is but one case standing for the general proposition that "full faith and credit extends to state court determinations of subject matter jurisdiction over a controversy, as well as the merits of the controversy itself." *Hooks*, 771 F.2d at 950. But such cases are grounded on the necessary ability of courts to determine the reach of their jurisdiction—usually a question of statutory interpretation. *Cf. Jones v. Giles*, 741 F.2d 245, 248 (9th Cir. 1984) ("An error in interpreting a statutory grant of jurisdiction is not ... equivalent to acting with total want of jurisdiction and does not render a judgment a complete nullity."). The Court in *Treinies* noted that the "power of the Idaho court to examine into the jurisdiction of the Washington court is beyond question. Even where the decision against the validity of the original judgment is erroneous, it is a valid exercise of judicial power by the second court." 308 U.S. at 78, 60 S.Ct. at 50. There is no such power of the Governor of Michigan to examine the validity of an Alabama criminal conviction—and any state law purporting to confer such a power would be patently unconstitutional.[2] We have held that where jurisdictional defects are patent, or where there is a "total want"

of jurisdiction, the Full Faith and Credit Clause does not apply. *Hooks*, 771 F.2d at 950.

Second, the district court held that *Branstad* cannot be applied "retroactively" because it is a new rule under *Teague v. Lane.* The use of *Teague* makes no sense in the context of a lawless executive decision to protect a fugitive from another state's criminal justice system. *Teague* concerned the finality of criminal convictions, and has never been applied to a civil proceeding (the finality of civil proceedings is governed by the doctrine of res judicata), let alone an executive hearing. Furthermore, *Teague* was based, in part, on the adequacy of direct review to correct major constitutional mistakes. 489 U.S. 288, 290, 109 S.Ct. 1060, 1064, 103 L.Ed.2d 334 (1989) (citing *Mackey v. United States*, 401 U.S. 667, 675, 91 S.Ct. 1160, 1164–65, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring)). An executive decision by the Governor of Michigan is not reviewable by state courts, *Germaine v. Governor*, 176 Mich. 585, 142 N.W. 738 (1913) (Michigan courts have no power to issue writ against governor), and therefore not reviewable by the Supreme Court on writ of certiorari. As a final matter, *Teague*, like the res judicata and full faith and credit doctrines, presupposes that there was a valid, final determination of the merits of an issue by a court, state official, or state legislature, of competent jurisdiction. Governor Milliken's exercise of authority to decide the merits of Chance's case was *itself* illegal. As a matter of law, therefore, there is nothing for Alabama to "collaterally attack."

---

**2.** Actually, the "asylum" hearing also violated the law of Michigan, although the Supremacy Clause renders this point of only secondary interest for the resolution of this appeal. Michigan adopted the State Uniform Criminal Extradition Act in 1937. The State Uniform Act is nearly identical to the federal Uniform Criminal Extradition Act, and calls for summary extradition upon proper request. M.C.L.A. § 780.1 *et seq. See also* Ala.Code 15–9–20 (same). Nothing in the State Uniform Act, nor anywhere else in the statutes of Michigan, suggests the possibility of "asylum." *Cf. People v. Marsh*, 125 Mich. 410, 84 N.W. 472 (1900) (governor's powers of clemency are limited to "procedures and regulations prescribed by law"). The only mention of a power to grant "asylum" appears in Governor

Milliken's own Notice of Extradition Hearing, Memorandum in Support of Plaintiff's Motion for Summary Judgment, at Exhibit B. That document announces that the "Executive Authority" shall consider three of the defenses that a state can consider without violating the Constitution,

(a) The legality and formality of the extradition papers;
(b) Whether or not the accused was in the demanding State at the time the offense was committed;
(c) The identity of the accused; and one defense that a state cannot,
(d) Equitable considerations as may be subject to executive clemency.

*Ibid.*

## IV

The Constitution forbids Governor Engler from refusing a proper request for extradition—regardless of the reasons he gives or the merits of any particular felon's case. We therefore REVERSE the district court's denial of the writ of mandamus, and direct that the writ issue.

NATHANIEL R. JONES, Circuit Judge, concurring.

The court's opinion accurately reflects the profile of extradition law today and appropriately reaffirms the power of the federal judiciary to enforce the terms of the Constitution of the United States and insure compliance by all States in the Union. Further, I agree with the opinion, that the arguments presented by Michigan are not legally persuasive. Nonetheless, I write separately to express my distress at being unable to affect the return of a citizen of this Country, or any human being, to a jurisdiction and prison system with a wretched history and, even more distressing, a present demeanor violative of international standards on the treatment of all prisoners.

Certainly, it is no secret that justice in the state of Alabama, particularly for the African–American, has been invisible or peculiar for all too much of that state's history. The instant case has reminded me of the Scottsboro saga, specifically, the plight of Haywood Patterson and Clarence Norris, two of nine African–American young men wrongfully charged, convicted, and sentenced (some to death) in Scottsboro, Alabama for the fabricated rape of two white women. *See Powell et al. v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); *see generally Clarence Norris and Sybil D. Washington, The Last of the Scottsboro Boys: An Autobiography* (1979). Patterson escaped from an Alabama prison detail, later to be granted "asylum" by Michigan Governor G. Mennen Williams. I shudder to think what would have happened to Patterson had

he been returned to Alabama. Providently, Alabama Governor George Wallace pardoned Norris in October 1976, forty-five years after he was wrongfully accused, twenty-five of which he spent in Alabama prisons. Although the similarities of the Scottsboro cases and the instant case presumably begin and end with Patterson's and Chance's escape from Alabama and asylum in Michigan, I can not help but pause and reflect.

Today, Chance will not be faced with lynch mobs or counterfeit retrials. He will, however, be tossed into a prison system that has adopted the barbaric "discipline" of the chain gang. This perpetuation of injustice cloaked in the tattered cloth of the Alabama justice system is deplorable. Equally offensive is the position recently espoused by an Alabama State Senator, riding what he obviously believes to be a popular political current, declaring slavery "good for blacks." *See Bible Backed Slavery, Says a Lawmaker, N.Y. Times*, May 10, 1996. In this current climate, reminiscent of the "Old South," which to some extent has been exported to other parts of the country, already difficult decisions are made more so for sensitive state officials forced to render prisoners, particularly African–American prisoners, back to jurisdictions like Alabama, which appear determined to resurrect harsh and inhumane treatment.

Even in the face of these strong reservations, the law must be followed.[1] I only wish, however, that penal institutions will soon shed rather than irrationally embrace socially vindictive policies and procedures soundly condemned as violations of international human rights norms. *See Chain-gangs Reintroduced in State Prisons*, Amnesty International News, Vol. 26 No. 1, January 1996. If South Africa can sign a new democratic Constitution and Pakistan can take steps toward a ban on flogging, surely, the state of Alabama, in the United States of America, can learn from its lamentable past and embrace

---

[1]. I respect the unfortunate limitation of our judicial review of an extradition request—indeed Michigan's limitations in reviewing Alabama's request—and recognize that my misgivings can-

not serve as a basis for refusal to extradite. Opinion at [1207], citing *Branstad*, 483 U.S. at 225, 107 S.Ct. at 2806–07, quoting *Kentucky v. Dennison*, 65 U.S. at 103.

modest principles of human rights. I hope so, for the sake of Philip Chance.