[No. B153201. Second Dist., Div. Seven. June 26, 2002.]

In re TIMOTHY WALTON on Habeas Corpus.

## COUNSEL

Leo Branton, Jr., and Lawrence Teeter for Petitioner.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, and J. Robert Jibson, Deputy Attorney General, for Respondent.

## OPINION

**WOODS, J.**—In this habeas corpus proceeding, an escapee from prison in the State of Georgia, now residing in California, challenges an extradition order returning him to Georgia to serve the remaining term of a seven-year sentence imposed in 1972 for the crime of armed robbery.[1] We conclude the writ should be denied in spite of petitioner's assertions that extraordinary circumstances are present in this case which militate against extradition to the State of Georgia. For the reasons hereafter explained, we deny the writ of habeas corpus.

### FACTUAL AND PROCEDURAL SYNOPSIS

Before stating in detail the checkered history of the activities of the State of Georgia relating to the extradition of Timothy Walton (Walton) it is helpful to focus on the essence of Walton's claim. Walton argues that because of his illness associated with acquired immune deficiency syndrome, commonly referred to as AIDS, a surrender to Georgia authorities

---

[1]Petitioner served a prior sentence of three years for the crime of burglary.

would cause undue stress, aggravate his condition, endanger his health, and lead to a de facto death sentence, all in violation of the constitutional proscription against cruel and unusual punishment. As a consequence, Walton urges that he should remain a free man here in California, the state of his residence and asylum. Walton is presently in constructive custody, having been released on bail. With this brief diversion, we turn to a recitation of the facts in more detail.

A synthesis of Walton's habeas corpus petition and the response of the People thereto reveal that on September 13, 1972, Walton, then age 19, was convicted of armed robbery in the State of Georgia following a plea of guilty. Walton maintains that no one was injured in the robbery and the net to him was $11. Walton's conviction led to a seven-year sentence where he was incarcerated in the Decatur Correctional Institution in Bainbridge, Georgia, until his escape six months later on April 28, 1973. Walton describes the escape as having occurred during a prison "riot" in which he and 23 other inmates escaped. The response of the People provides more facts and is more graphic in the description of the escape and gives details portraying the overcoming of guards, the binding and gagging of officers, the stealing of keys and guns and the confiscation of two police vehicles, one of which was wrecked in the process, while the other vehicle was recovered after abandonment by the escapees. The description provided by the People lends itself to a reasonable inference that the escape was systematic, well planned and the result of prior deliberations rather than a "riot." Be that as it may, both parties agree that Walton made his way to California following his escape where he is presently in asylum; is married; has both children and grandchildren; is approximately 50 years old; and is afflicted with AIDS.

In June of 1975 Walton was arrested in Los Angeles County for domestic violence, which Walton describes as a domestic "squabble." Walton was retained in the custody of the Los Angeles Police Department on the fugitive hold from the Georgia Department of Corrections. Walton remained in the Los Angeles County jail for over one year awaiting the disposition of the fugitive warrant from the State of Georgia.

On June 11, 1975, Georgia Governor George Busbee sent a requisition with accompanying documentation to California Governor Edmund G. Brown, Jr., requesting the extradition of Walton to the State of Georgia. In February 1976, the California Governor's Office received and granted Walton's request for review and held a Governor's hearing. Following the hearing, on April 13, 1976, a Governor's warrant was issued by California Governor Brown and forwarded to the chief of police in Los Angeles County for the extradition of Walton. Two months later, on June 30, 1976, the

California Governor's Office sent a letter to the chief of police in Los Angeles authorizing the withdrawal of the Governor's warrant. In June of 1976, California Lieutenant Governor, Mervyn Dymally, was acting in his capacity as Acting Governor by virtue of the absence of Governor Edmund G. Brown, Jr., from the State of California. In authorizing the withdrawal of the previously issued rendition warrant Lieutenant Governor Dymally gave "reasons" for the withdrawal which included that Walton was "young . . . ," "about to be married . . . ," and "my concern for Mr. Walton's safety . . . in the Georgia prison system."[2] Walton was then released from custody. Walton maintains that the rejected extradition request from Georgia was with Governor Brown's concurrence.

In 1998, Walton was stopped by the Los Angeles Police Department on a traffic violation and retained in custody on the outstanding Georgia fugitive warrant. Walton describes the traffic violation as "minor." The People assert that Walton has been no stranger to law enforcement officials in Los Angeles County, buttressing this conclusion by stating that Walton was arrested and charged with infliction of corporal injury upon a spouse/cohabitant in 1976; arrested in Los Angeles County and charged with assault with a firearm on a person in 1995; and arrested once again and charged and convicted of battery on a person in November of 1996. On December 2, 1998, the district attorney of Decatur County in Georgia wrote a letter to the Los Angeles Police Department, fugitive detail, stating that after reviewing a "limited amount of paperwork" concerning Walton, including a June 9, 1976, letter from Lieutenant Governor Mervyn Dymally withdrawing the Governor's warrant, they would not seek Walton's extradition for the purposes of prosecution on escape charges. The People maintain that the district attorney's decision not to pursue extradition was solely in connection with pending escape charges, and not the original armed robbery commitment. Walton, on the other hand, maintains that the letter of the district attorney of Decatur County in Georgia, one J. Brown Moseley, is subject to only one logical interpretation, that being that the district attorney would not seek any extradition by reason of the use of the words "will not" which were underscored in the text of the letter dated December 2, 1998.

Walton was again arrested in Los Angeles County on March 24, 1999, on local charges and detained on the still-outstanding Georgia Department of Corrections' fugitive warrant. However, the Los Angeles Police Department

---

[2]The description of Lieutenant Governor Dymally's reasons for withdrawing the previously issued warrant is contained in the People's response as exhibit M purporting to be a copy of a letter dated September 20, 2001, from General Counsel William F. Amideo, of the Georgia Department of Corrections, to the Honorable Steve Cooley, District Attorney for the County of Los Angeles. Mr. Amideo generally describes the actions of Acting Governor Dymally as an unauthorized "clemency" decision.

released Walton from custody after he produced a copy of the 1976 letter withdrawing the Governor's rendition warrant. In April 2001, Walton was once more arrested in Los Angeles County on a traffic violation and was held on the fugitive warrant from the Georgia Department of Corrections. Walton describes the stop as emanating from his riding a bicycle without a light at dusk. Georgia officials were notified of Walton's arrest under the outstanding fugitive warrant from Georgia and his incarceration in the Los Angeles County jail awaiting possible extradition to the State of Georgia. On April 23, 2001, Walton was arraigned on the fugitive charges and signed a waiver of extradition pursuant to Penal Code section 1551.1. Walton thereafter sought to withdraw his waiver and the court below granted Walton's request.

Following the withdrawal of the waiver by Walton, the Los Angeles Police Department advised Georgia authorities that petitioner now refused to waive extradition and it would be necessary to obtain a Governor's warrant for Walton's extradition. Thereafter, on June 14, 2001, Georgia Governor Ray E. Barnes forwarded a requisition with accompanying documents to California Governor Gray Davis requesting the extradition of Walton to the State of Georgia based on the unserved prison commitment for his armed robbery conviction.

Following approval of Georgia's requisition papers by the California Attorney General's Office on July 3, 2001, Governor Gray Davis issued a rendition warrant for extradition, which was forwarded to the Los Angeles Police Department on July 9, 2001, for service. Following his arrest, Walton maintains that he was represented by the Office of the Los Angeles County Public Defender. Walton maintains that on July 3, 2001, California Governor Gray Davis signed an order authorizing extradition by the State of California as requested by the State of Georgia. Walton contends Governor Davis's order was signed in spite of the absence of any effort by his counsel from the Los Angeles County Public Defender's Office to seek a Governor's hearing as allowable under California law. Walton was formally arraigned and served with the Governor's warrant on July 11, 2001. However, he was not remanded to custody, but was released on $1,500 bail by Judge Henry Barela presiding in Criminal Division 030 of the Municipal Court[3] of California, County of Los Angeles, and the matter continued to July 18, 2001, to allow Walton the opportunity to challenge his extradition by way of a writ of habeas corpus.

[3]We note that the proceedings before Judge Barela actually occurred in the superior court as a post-court-unification matter and we infer that the "Municipal Court" designation on that portion of the form order is a result of incomplete administrative transition.

Walton subsequently filed two writ petitions in the Los Angeles County Superior Court, Department 100, both of which were summarily denied.[4] Thereafter, the appellate division additionally denied Walton's request for an additional stay of his extradition. On August 3, 2001, petitioner returned to division 30 (superior court as a result of court unification) with privately retained counsel. The court refused to remand Walton into custody, allowed him to remain free on bond, and ordered him to voluntarily report to Georgia within a "reasonable time." The court set another date of September 7, 2001, for a "progress report" as to what was going on in Georgia.

On September 7, 2001, Walton personally appeared again in the Los Angeles County Superior Court, Division 30, with his privately retained counsel. Walton had not made any arrangements to surrender to the Georgia authorities. The transportation agents from the Georgia Department of Corrections were present at the hearing. The deputy district attorney argued that Walton should be remanded in accordance with California Penal Code section 1550.1 and turned over to the agents from Georgia. After hearing the argument of Walton's counsel on the status of Walton's health, the court refused to remand Walton into custody and set a new court date for October 22, 2001, for another "progress report" on the proceedings in Georgia and in the Court of Appeal here in California. The reporter's transcript of the proceedings reveals the following colloquy among the court and counsel:

"THE COURT: Mr. Creary, want to tell me about your client's health? Where is it at?

"MR. CREARY: It is currently failing. He has fluid in his lungs. He's got persistent dry cough. I'm not a doctor, Your Honor, but I believe he's in the beginning stages of pneumonia. [¶] His doctor has indicated in an affidavit, which I don't know if—does the Court have a copy of the writ?

"THE COURT: I don't think I do.

"MR. CREARY: May I approach with a copy?

"THE COURT: You can just paraphrase what's there.

"MR. CREARY: Basically, his doctor, Your Honor, has stated in an affidavit that he has a very short life expectancy. That without his medication being administered to him on a regular basis and without his being closely

---

[4]In actuality Walton filed a single habeas corpus petition in department 100 of the Los Angeles County Superior Court, but amended the petition to state additional grounds. The original writ and the amendment thereto were denied.

monitored, he has less than a year to live. [¶] Even—quoting, 'Even with proper monitoring medication, Mr. Walton has a very short life expectancy, in my opinion, no more than four to five years.' [¶] So his health is not good and worse than it was the last time he was in court. And the doctor is very concerned that if he is no longer able to monitor his patient on a regular basis, on an outpatient basis, he's afraid that he's not going to survive.

"THE COURT: Thank you. [¶] Anything else, Mr. Naiman?

"MR. NAIMAN: Only, Your Honor, that I think we have a very, very interesting legal situation where a valid governor's warrant was issued. The officials from the foreign state are here for pickup. I'm not sure that we are in a position to interfere with their picking him up. Plus if the Court recalls, Judge Oki ordered no stays.

"THE COURT: I've heard enough. [¶] This Court believes that it is the court's function to address issues that come up with resolutions that are equitable in nature. And sometimes the courts have to bend the rules, I would think, in order to make sure that justice is served. And I can't see that justice is going to be served by throwing Mr. Walton in right now. [¶] The Court is going to leave him on bond. There's going to be a progress report on the proceedings in Georgia and the Appeals Court here in California for October 22nd here in Division 30. [¶] Thank you.

"MR. NAIMAN: Your Honor, I would ask the Court to order counsel, myself, Mr. Walton to Department 100 for further proceedings on the writ of habeas corpus.

"THE COURT: That was denied.

"MR. NAIMAN: I understand—

"THE COURT: My order is as it stands. [¶] Thank you.

"THE DEFENDANT: Thank you, Your Honor."[5]

On September 25, 2001, Walton filed a petition for writ of habeas corpus with this court and on September 28, 2001, this court ordered the Attorney

---

[5]Walton maintains in his habeas corpus petition that once he "left the courtroom George [sic] officials stated that they intended to immediately take petitioner into custody notwithstanding the court's order denying their request to do so on that date. Petitioner collapsed from the stress of this encounter. When the actions of Georgia officials were brought to the court's attention, the court repeated that petitioner was not to be removed from the State at this time."

General to respond to the petition within 10 days. That response was filed on October 5, 2001. On October 11, 2001, Walton filed a reply to the attorney general response. As indicated previously, the essence of Walton's claim deals with his illness associated with acquired immune deficiency syndrome. In Walton's petition for writ of habeas corpus Walton spells out at paragraphs 11, 12, 13, and 14 the essence of his claim as follows:

"11. Since 1998, Petitioner has suffered from full-blow Aids [*sic*].

"12. Petitioner's current physician, Ronald Jefferson, M.D., declares that Petitioner is now under treatment on an outpatient basis at Martin Luther King Jr. Hospital, that Petitioner's life-expectancy is less then [*sic*] one year unless he continues to receive carefully monitored medication for his very serious illness, that his life-expectancy is in any event four to five years, that it is important that Petitioner continue to receive treatment from those who are familiar with his medical history, that patients in Petitioner's condition are best treated on an outpatient basis to minimize their subjection to stress, and that the stress of incarceration could have a devastating effect on Petitioner's ability to survive. When Petitioner began treatment at Martin Luther King Hospital, he was near death, but the quality of his outpatient care has raised his T-cell count from 2 to 71. A normal person has a T-cell count of 800 or above, and a T-call [*sic*] count lower than 200 indicates that full-blown Aids [*sic*] has developed. The Declaration of Dr. Jefferson is attached hereto as Exhibit B.

"13. Incarceration by the Georgia Department of Corrections and the process of being transferred to the State of Georgia and to its state prison from the county jail facilities carry a significant risk that prisoners in Petitioner's position may miss life sustaining medication doses. Close living quarters and inadequate ventilation subject such prisoners to significant risks of exposure to diseases which their compromised immune systems cannot withstand. Blood-born [sic] illnesses such as hepatitis are also transmitted within the prison population. (See Exhibit C, Declaration of Tamara H. Serwer, attorney at law).

"14. Petitioner is now held in the constructive custody of the State of California based on a fugitive warrant from the State of Georgia and is threatened with a de facto sentence of death should he be extradited to Georgia and suffer an interruption of his current treatment, the life-endangering stress of incarceration and the enhanced danger of infection and interruption of access to medication which are needed to sustain his life."

On October 31, 2001, this court issued its "Order to Show Cause" why the Sheriff of Los Angeles County should not be compelled to grant the relief

prayed for in Walton's petition for writ of habeas corpus. The matter was set for hearing at 10 a.m. on January 10, 2002. Walton's extradition was stayed pending further order of this court.

Subsequently, the People filed on November 16, 2001, a return to the order to show cause and Walton filed his traverse to the People's return on November 28, 2001.

On January 29, 2002, through a letter of Joseph A. Lane, Clerk of the Court of Appeal, Second Appellate District, to all counsel, this court requested supplemental briefing as follows:

"Dear Counsel:

"During its independent research of the issues raised by this Habeas Corpus petition, the court has discovered issues not specifically raised in the court's Order to Show Cause, nor addressed in the parties' briefing, which may be determinative of the outcome of this proceeding. Accordingly, the court requests supplemental briefing as to the following issues.

"(1) Did the 1976 Governor's Hearing resulting in an order denying extradition, which order was never challenged in the courts before or after the U.S. Supreme Court's decision in *Puerto Rico v. Branstad* (1987) 483 U.S. 219 [107 S.Ct. 2802, 97 L.Ed.2d 187], constitute res judicata barring a further and future petition for extradition?

"(2) Did the cumulative effect of the expiration of 30 years between petitioner's escape and this current extradition request and the quarter century delay after California's initial denial of the first request coupled with Georgia's failure to seek extradition when offered that opportunity in 1998 constitute laches/estoppel/waiver barring a later extradition request?

"(3) Is a state's constitutional right to extradition subject to an individual's constitutional right to fundamental fairness as expressed in the due process clause, and if so, did Georgia forfeit its right to constitutionally extradite Walton through its cumulative behavior over the past thirty years? [See, e.g., *People ex rel. Bowman v. Woods* (1970) 46 Ill.2d 572 [264 N.E.2d 151].] Or, is there no longer a due process right to fundamental fairness in the implementation of a state's right to extradition after the U.S. Supreme Court's decision in *Puerto Rico v. Branstad*[, *supra*,] 483 U.S. 219?

"(4) Assume this court were to conclude petitioner has raised substantial claims of res judicata and/or laches and/or estoppel and/or express waiver

and/or constitutional denial of due process sufficient to bar a state from seeking extradition under the circumstances of this case. Further assume this court were to conclude, nonetheless, that these issues were properly resolved in the Georgia courts rather than in the courts of this state. And, further assume this court were to find it would seriously impair petitioner's health and perhaps survival for him to be transported to and incarcerated in Georgia while the legal propriety of this extradition demand is adjudicated. Does this court have the power to continue petitioner on bail in this state (subject, of course, to the petitioner waiving any right to be personally present in the Georgia courts while his rights are being litigated in those courts) for a period of time sufficient for petitioner to seek appropriate relief in the Georgia courts and for those courts to determine whether any of the above legal grounds or other legal grounds are sufficient to preclude the Georgia executive from seeking and obtaining extradition to that state? If this court has the power to do so, should the court exercise that power?"

On February 11, 2002, Walton filed his supplemental brief and on February 20, 2002, the supplemental brief of the People was filed.

## DISCUSSION

### I. *The State of Georgia is entitled to extradition and Walton does not state a sufficient basis to deny extradition.*

In *Michigan v. Doran* (1978) 439 U.S. 282 [99 S.Ct. 530, 58 L.Ed.2d 521], the United States Supreme Court had occasion to revisit the interstate extradition clause contained in the United States Constitution. Until *Doran*, the law pertaining to the extradition clause was frozen in an antiquated pre-Civil War case entitled *Kentucky v. Dennison* (1861) 65 U.S. (24 How.) 66 [16 L.Ed. 717], which in capsule form held that the clause as applied between states provided for the infusion of morality principles between the asylum state and the rights of the demanding state. The word "duty" was interpreted as not requiring mandatory and compulsory compliance. In effect, the clause was not enforceable by the federal government in a dispute between the states. ■ But in *Doran*, the high court explained that "interstate extradition was intended to be a summary and mandatory executive proceeding derived from the language of Art. IV, § 2, cl. 2, of the Constitution." The court further explained, "A governor's grant of extradition is prima facie evidence that the constitutional and statutory requirements have been met. . . . Once the governor has granted extradition, a court considering release on habeas corpus can do no more than decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether

the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive. These are historic facts readily verifiable." (*Doran*, at p. 289 [99 S.Ct. at p. 535].)[6]

Since *Doran*, the high court has repeatedly reinforced these limitations on the function of the courts in the asylum state. A sample of these decisions is to be found in *New Mexico ex rel. Ortiz v. Reed* (1998) 524 U.S. 151, 152 [118 S.Ct. 1860, 1860-1861, 141 L.Ed.2d 131] and *California v. Superior Court of California* [(*Smolin*)] (1987) 482 U.S. 400, 408 [107 S.Ct. 2433, 2438-2439, 96 L.Ed.2d 332]. California law, of course, is in accord. (Pen. Code, § 1550.1.) The Supreme Court, with other state and federal courts, has also consistently held that even alleged constitutional violations that might result from the extradition of a fugitive may not be raised in the asylum state courts. (*New Mexico ex rel. Ortiz v. Reed, supra,* 524 U.S. 151.) It is simply not for officials in the asylum state to make determinations, beyond those authorized by the Supreme Court, which affect a demanding state's constitutional right to obtain custody of fugitives from its justice. In *Puerto Rico v. Branstad, supra* 483 U.S. 219, 227 [107 S.Ct. 2802, 2807-2808], the high court reaffirmed "the conclusion that the commands of the Extradition Clause are mandatory, and afford no discretion to the executive officers or courts of the asylum State." And in *California v. Superior Court of California* [(*Smolin*)], the court said: "The Federal Constitution places certain limits on the sovereign powers of the States, limits that are an essential part of the Framers' conception of national identity and Union. One such limit is found in Art. IV, § 2, cl. 2, the Extradition Clause: [¶] 'A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.' [¶] The obvious objective of the Extradition Clause is that no State should become a safe haven for the fugitives from a sister State's criminal justice system." (*California v. Superior Court of California* [(*Smolin*)], *supra,* 482 U.S. at pp. 405-406 [107 S.Ct. at pp. 2437].)

 It appears to this court that Walton's specific complaint that his health and physical well-being will be endangered by allowing him to be extradited to Georgia because of conditions within that state's prison system, has been rejected several times by the Supreme Court. A sample of this rejection is contained in *Sweeney v. Woodall* (1952) 344 U.S. 86 [73 S.Ct. 139, 97 L.Ed. 114]. The court held that a fugitive from Alabama could not raise in the courts of Ohio, the asylum state, the constitutionality of his

---

[6]The existence of the four prerequisites announced by the high court in *Doran* go unchallenged by Walton in this case.

confinement in Alabama. The court stated: "Considerations fundamental to our federal system require that the prisoner test the claimed unconstitutionality of his treatment by Alabama in the courts of that State. [The prisoner] should be required to initiate his suit in the courts of Alabama, where all parties may be heard, where all pertinent testimony will be readily available and where suitable relief, if any is necessary, may be fashioned." (*Id.* at p. 90 [73 S.Ct. at p. 141].)

This court is of the opinion that the United States Supreme Court has spoken clearly and on numerous occasions on the subject before us in this petition for writ of habeas corpus. But before we come to a final disposition that Walton's petition for writ of habeas corpus should be denied, we consider the flagship of Walton's opposition to extradition, namely a "special circumstances" exception announced in *People ex rel. Bowman v. Woods, supra,* 264 N.E.2d 151.

In *Bowman v. Woods,* the Illinois Supreme Court held that a mere passage of time would not necessarily discharge a petitioner from extradition who had escaped from an Alabama prison in 1952. The time interval in *Woods* was a 13-year delay involving the demanding State of Alabama and the asylum State of Illinois. The Illinois court, however, held that the unexplained 13-year delay between the first extradition proceedings and a last effort, during which time Alabama knew of the petitioner's presence in Illinois and twice refused to extradite him, worked a forfeiture of Alabama's extradition rights.

Without the need to resort to citations for the well-known and established principle that the decision of one of our sister states is persuasive authority only and not binding on the courts of this state, we question whether the *Woods* decision has any viability in view of *Doran, Branstad, Smolin, Reed,* and *Sweeney.* It appears to this court that *Bowman* and any progeny contradict the aforementioned United States Supreme Court decisions.

II. *The trial court has disregarded provisions contained in California's version of the Uniform Criminal Extradition Act.*

The proceedings in the lower court have disregarded, perhaps for well-intentioned sympathy, the explicit provisions of California's version of the Uniform Criminal Extradition Act. Pursuant to Penal Code section 1552.1, when a fugitive is arrested in California and "it is shown that the prisoner is alleged to have escaped . . . following conviction of a crime punishable in the state of conviction by imprisonment for a term exceeding one year," he may not be admitted to bail but must be retained in custody pending the

issuance and service of a Governor's rendition warrant. However, in this case, petitioner was released on bail on May 11, 2001, after his fugitive arrest, in violation of section 1552.1 of the Penal Code.

Subsequently, the Governor's rendition warrant was issued and served upon petitioner. Penal Code section 1550.1 requires that the prisoner be arraigned on the warrant and remanded to custody so as to guarantee availability to be picked up by agents of the demanding state. The section provides an opportunity for the prisoner to challenge his extradition by way of habeas corpus, but specifically requires that "the person named in the warrant shall be held in custody at all times, and shall not be eligible for release on bail" pending the resolution of the petition. This no-bail provision has been held to be constitutional. (See *People v. Superior Court (Ruiz)* (1986) 187 Cal.App.3d 686 [234 Cal.Rptr. 214].)

On September 7, 2001, this provision was pointedly brought to the attention of the judge in Department 30 of the Los Angeles Superior Court, the Honorable Henry Barela, who nevertheless disregarded it and released Walton. In the judge's view, he needed to "bend the rules . . . in order to make sure that justice is served."

A strong inference is drawn by this court that Judge Barela has no intention of following the law by surrendering Walton as commanded by the Governor's warrant, even though Walton's habeas corpus challenge had been twice rejected by the judge in department 100 of the Los Angeles County Superior Court.

We take note of counsel's arguments for imposition of forfeiture, waiver, estoppel, laches, and res judicata principles to prevent Walton's extradition to the State of Georgia. But, as mentioned previously, the United States Supreme Court has spoken clearly and without hesitation on the subject in the aforementioned cases before the high court. This court is not required to confront and address every issue mentioned by counsel if the relevance is minimal. ■ "Appellate courts generally will not address issues whose resolution is unnecessary to disposition of the appeal. [Citations.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2001) ¶ 8:202, p. 8-103.) We do, however, address the "waiver" and "estoppel" issues raised by Walton, in part III, *post*.

III. *Extradition was not waived by the State of Georgia, nor is Georgia estopped from seeking extradition.*

■ That Walton is in the final stages of a life-threatening illness is not only unfortunate but also relevant to the proper conditions for his

948

confinement in California (pending extradition) and Georgia. Issues of the appropriate custodial treatment for Walton, however, are not before us. The status of Walton's health simply is not relevant to the right of the State of Georgia to demand his extradition or the obligation of the State of California to honor that demand in accordance with article IV, section 2, clause 2 of the United States Constitution. (*Pacileo v. Walker* (1980) 449 U.S. 86, 88 [101 S.Ct. 308, 309, 66 L.Ed.2d 304] [challenge to prison conditions in demanding state must be tried in the courts of that state]; *Sweeney v. Woodall, supra,* 344 U.S. 86, 90 [73 S.Ct. 139, 140-141] [same]; see *Puerto Rico v. Branstad, supra,* 483 U.S. 219, 227 [107 S.Ct. 2802, 2807-2808, 97 L.Ed.2d 187] [commands of the extradition clause of the United States Constitution are mandatory].)

Beyond the four "readily verifiable questions"—whether the extradition documents are facially valid, whether the petitioner has been charged with a crime in the demanding state, whether the petitioner is the person named in the extradition request and whether the petitioner is a fugitive (*Michigan v. Doran, supra,* 439 U.S. 282, 289 [99 S.Ct. 530, 535-536]; *In re Gilchrist* (1982) 134 Cal.App.3d 867, 871 [184 Cal.Rptr. 861]; *People v. Superior Court* (*Lopez*) (1982) 130 Cal.App.3d 776, 783 [182 Cal.Rptr. 132])—which are not at issue in this case, the only matter that Walton may properly raise is whether the State of Georgia has, by its actions prior to 2001, waived (or forfeited) its right to seek Walton's extradition from California. California courts considering this issue, however, have uniformly rejected any waiver or estoppel defense to extradition.

"The mere fact that extradition proceedings may have been commenced but not completed, or the fact that the whereabouts of the person may have been known to the authorities in the state from which he fled, does not change his status nor discharge his obligation to answer the charge or serve the remainder of his sentence. . . . [W]hen, as in the instant proceeding, the governor of Texas from which state the prisoner has fled has demanded his arrest and detention, and the governor of California, upon whom the demand has been made, has certified that the representations of the governor of the demanding state are true and that the prisoner sought is a fugitive from justice, we do not believe that a court is justified in discharging the prisoner upon the ground that the demanding state has waived its right to extradite him . . . ." (*In re McBride* (1953) 115 Cal.App.2d 538, 543 [254 P.2d 117]; accord, *People v. Superior Court* (*Lopez*), *supra,* 130 Cal.App.3d at p. 783; see also *In re Gilchrist, supra,* 134 Cal.App.3d at p. 871 [waiver of right to extradite must be intentional and will not be inferred from equivocal record].)

In *In re Gilchrist, supra,* 134 Cal.App.3d 867, a case with many similarities to Walton's, the petitioner had escaped from a prison work camp in

Oklahoma in 1969 and fled to California. While here, Gilchrist was convicted of a new offense and, in 1971, sentenced to a federal prison in California. Gilchrist contacted Oklahoma and demanded extradition. (*Id.* at p. 870.) In response, the "Oklahoma authorities releas[ed] their detainer, stating 'This subject is no longer wanted by this department.'" (*Id.* at p. 869.) In the years following his discharge from federal custody, Gilchrist was arrested and released three separate times on the Oklahoma warrant. However, in 1981, when Oklahoma again requested Gilchrist's extradition following an arrest, Governor Brown issued an extradition warrant. (*Id.* at pp. 870-871.) The Court of Appeal rejected Gilchrist's claim that Oklahoma had waived its right to seek his extradition, notwithstanding Gilchrist's personal circumstances that suggested he had fully rehabilitated himself and that further punishment would serve no useful purposes: "Were it our decision to make, as a matter of justice and equity, we would agree with the trial court [which had granted Gilchrist's petition for a writ of habeas corpus and discharged him from custody]. It does not appear from the record there is any good reason for Oklahoma's current warrant and no proper penal purpose is served by incarcerating a law abiding rehabilitated citizen. However, we are not vested with such discretion in extradition proceedings." (*Id.* at p. 871.)

Georgia's efforts (and, to some extent, lack of effort) to extradite Walton are thoroughly described in the "Factual and Procedural Synopsis" of this opinion, *ante*, and in Justice Johnson's dissenting opinion. Nothing in the record is persuasive that this is a more compelling case for waiver or estoppel than presented to the Courts of Appeal in *In re McBride, supra,* 115 Cal.App.2d 538, *People v. Superior Court (Lopez), supra,* 130 Cal.App.3d 776, or *In re Gilchrist, supra,* 134 Cal.App.3d 867. Nor are the circumstances sufficiently extraordinary to warrant creation of even a rare and limited exception to the command of *Puerto Rico v. Branstad, supra,* 483 U.S. 219, 227 [107 S.Ct. 2802, 2807-2808].

DISPOSITION

The petition for writ of habeas corpus is denied. The temporary stay of the extradition order previously issued by this court on October 31, 2001, is hereby extended to August 20, 2002.

Perluss, J., concurred.

**JOHNSON, Acting P. J.,** Dissenting.—"Even convicted criminals are entitled to be treated by their government in a fair and straightforward manner." (*Johnson v. Williford* (9th Cir. 1982) 682 F.2d 868, 872.)

I respectfully dissent.

In this habeas corpus proceeding, a long-time California resident challenges an extradition order returning him to Georgia to serve the remaining term of a sentence for a 30-year-old crime. Unlike my colleagues, I conclude this is one of those extraordinarily rare instances where a state's behavior in the extradition process itself—involving undue delay, earlier ignored opportunities to pursue extradition, and an express waiver—violated petitioner's due process rights to fundamental fairness. Consequently, I would grant the writ of habeas corpus and dissolve the extradition order.

## I. *The Evolution of Extradition Law and Its Impact on Petitioner.*

This is one of those cases where my discussion of the law requires a more thorough exposition of the facts than is found in the majority opinion. It likewise helps to briefly rehearse the history of the law of extradition in this country.

When the United States Constitution was adopted by the states, it included a specific provision authorizing one state to demand extradition of accused defendants or convicted criminals from another state. That provision reads in its entirety: "A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime."[1]

This extradition subsection of the Constitution is followed immediately by a companion provision requiring a state to "deliver[]up" to the owner any slaves who may have managed to escape from another state.[2] This unfortunate juxtaposition may help account for the fact many governors in free states refused to extradite to slave states persons charged with crimes involving slavery, during the first four score and seven years of the nation's history. This practice led to a Supreme Court decision issued on the eve of the Civil War which essentially modified the Constitution's extradition provision for a full century and a quarter.

That decision, *Kentucky v. Dennison*,[3] arose when Kentucky sought extradition from Ohio of a "free man of color," who happened also to be an

---

[1]United States Constitution, article IV, section 2, clause 2.

[2]"No person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due." (U.S. Const., art. IV, § 2, cl. 3.)

[3]*Kentucky v. Dennison* (1861) 65 U.S. (24 How.) 66 [16 L.Ed. 717].

Ohioan, for the felony of assisting the escape of a slave. The Ohio governor refused, asserting as grounds the fact the charged felony was not a crime in Ohio nor considered a crime "by the conscience of civilized nations."[4] Kentucky then filed an original action in the United States Supreme Court seeking a writ of mandamus directed against the Ohio governor compelling the extradition of this fugitive.

In its opinion filed in early 1861, after secession but before hostilities began, the Supreme Court first found the Constitution created a "ministerial" duty for one state to extradite persons charged with crimes in another state, irrespective of the nature of the crime.[5] However, the court went on to explain "the words 'it shall be the duty' were not used as mandatory and compulsory, but as declaratory of [a] *moral* duty."[6] Because this was only a moral duty, the compact between the states declared in the extradition clause of the United States Constitution was not enforceable by the federal government, including the federal courts. As the court explained: "The act [implementing the extradition clause] does not provide any means to compel the execution of this duty, nor inflict any punishment for neglect or refusal on the part of the Executive of the State; nor is there any clause or provision in the Constitution which arms the Government of the United States with this power. Indeed, such a power would place every State under the control and dominion of the General Government, even in the administration of its internal concerns and reserved rights. And we think it clear, that the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it."[7]

Over the next century and a quarter, with no federal whip to compel rigid compliance, the states developed a set of practices which tolerated some measure of discretion in extradition decisions. While governors generally granted extradition requests, occasionally they found compelling reasons not to and those rejections were seldom challenged.

This still was the state of the law and practice in extradition matters in 1972 when petitioner, Timothy Walton, at the age of 19, was convicted of armed robbery in Georgia and received a seven-year prison sentence. A few months into the sentence Walton was caught up in a prison riot and, along with a number of other prisoners, escaped. Over a period of months, he made his way to California where he has lived ever since. During the intervening 30 years he married, had children and grandchildren, and had only a few minor problems with the law.

[4]*Kentucky v. Dennison, supra,* 65 U.S. at page 69.
[5]*Kentucky v. Dennison, supra,* 65 U.S. at page 106 [16 L.Ed. at page 729].
[6]*Kentucky v. Dennison, supra,* 65 U.S. at page 107 [16 L.Ed. at page 729], italics added.
[7]*Kentucky v. Dennison, supra,* 65 U.S. at page 107 [16 L.Ed. at page 729].

In June 1975, however, Walton was involved in a domestic squabble and arrested. The Georgia fugitive warrant surfaced and Georgia officials filed an extradition request with the California Governor's Office. Walton remained in jail while California officials considered that request. A year later, in July 1976, the Governor's Office held an extradition hearing. Lieutenant Governor Mervyn Dymally, then the Acting Governor due to the Governor's out-of-state trip, denied extradition, citing primarily poor conditions in Georgia's prison system. Although somewhat unusual, this action was consistent with the then existing law and practice of governors in considering extradition requests. Also consistent with that law and practice, Georgia did not seek relief from California's rejection of its extradition request.

Nearly a decade later, in 1986, Walton was arrested but not convicted for corporal injury on a spouse/cohabitant. As a consequence, California authorities presumably notified Georgia that Walton was again available for an extradition request.[8] Consistent with California's rejection of its earlier extradition request and the then prevailing law and practices, Georgia did not bother to renew its request.

That law and those practices had only another year to run, however.

In 1987, the United States Supreme Court overturned *Kentucky v. Dennison*, and its implicit sanctioning of one state's power to deny an extradition request from another state. In an opinion written by Justice Marshall, *Puerto Rico v. Branstad*,[9] the nation's high court ruled the federal government and its courts could compel compliance with the Constitution's extradition clause and implementing legislation. What had been considered only a "moral" duty became a mandatory duty, and one the federal courts would enforce, where necessary.

The fugitive in *Puerto Rico v. Branstad* obviously was not charged with helping a slave. Instead he was accused of first degree murder of a pregnant woman in Puerto Rico. When he jumped pretrial bail and fled home to Iowa, the Puerto Rican officials asked the Iowa Governor to extradite the defendant back to Puerto Rico. After a hearing, the Iowa Governor declined,

---

[8]The limited record available in this habeas corpus proceeding does not exclude the possibility California did not bother with such a notification given the fact California had previously rejected such a request and this refusal was consistent with prevailing law and practice. But it would require a remand for a hearing in the trial court to resolve this and several other factual issues in this case.

[9]*Puerto Rico v. Branstad* (1987) 483 U.S. 219 [107 S.Ct. 2802, 97 L.Ed.2d 187].

apparently based on representations a " 'white American man . . . could not receive a fair trial' " in Puerto Rico and witnesses had been "bought."[10]

Despite *Kentucky v. Dennison*, Puerto Rico sought the intervention of the federal courts, filing an action in the United States District Court. That court dismissed, finding it was still controlled by the bar of the Supreme Court's decision in *Kentucky v. Dennison*[11] and the Circuit Court of Appeals reluctantly affirmed this dismissal. In reversing the denial of relief, the Supreme Court explained why it was overruling the 1861 decision. "It has long been a settled principle that federal courts may enjoin unconstitutional action by state officials. . . . [¶] . . . Considered *de novo*, there is no justification for distinguishing the duty to deliver fugitives from the many other species of constitutional duty enforceable in the federal courts. . . . [¶] Respondents contend, however, that an 'executive common law' of extradition has developed through the efforts of Governors to employ the discretion accorded them under *Dennison*, and that this 'common law' provides a superior alternative to the 'ministerial duty' to extradite provided for by the Constitution. . . . Even assuming the existence of this tradition of 'executive common law,' no weight can be accorded to it. Long continuation of decisional law or administrative practice incompatible with the requirements of the Constitution cannot overcome our responsibility to enforce those requirements."[12]

After *Branstad* clarified the duty to grant extradition requests was not merely a moral duty but an enforceable ministerial duty, one might have thought Georgia would renew its request for Walton's return to that state's prison—at least if it still wanted him. But no request was forthcoming.

Later, Georgia had two more chances to initiate extradition proceedings during the mid-1990's, yet took no action. In 1995 Walton was arrested but not convicted for assault with a firearm and in 1996 he was arrested and convicted of battery. In both of these cases California officials presumably discovered the outstanding fugitive warrant and notified Georgia they had defendant in custody. Yet nothing in the record suggests Georgia lodged an extradition request.

On December 12, 1998, some 22 years after California declined Georgia's first extradition request and 11 years after the Supreme Court decision in *Branstad*, Walton was stopped on a minor traffic violation and the officer's

---

[10]*Puerto Rico v. Branstad, supra*, 483 U.S. at page 222 [107 S.Ct. at page 2805].

[11]*Puerto Rico v. Branstad, supra*, 483 U.S. at pages 222-223 [107 S.Ct. at pages 2805-2806].

[12]*Puerto Rico v. Branstad, supra*, 483 U.S. at pages 228-229 [107 S.Ct. at page 2808], citations omitted.

computer once again picked up on the quarter-century-old fugitive warrant from Georgia. California contacted Georgia law enforcement officials. In what is a somewhat ambiguous reply to the Los Angeles Police Department's fugitive section, the District Attorney for the South Georgia Judicial Circuit wrote:

"Please be advised that I am in possession of a limited amount of paperwork concerning the above named fugitive. Included is correspondence dated June 11, 1975 from Honorable George Busby [sic], Governor of the State of Georgia and communication dated June 9, 1976 from Mervyn Dymally, acting Governor of California. I also have a copy of the indictment charging Timothy Walton with armed robbery in Muscogea County Superior Court.

"After having discussed this matter with Danelle Gaul, in our Governor's office and having reviewed what information I have, be advised that the State of Georgia WILL NOT seek extradition of this subject for the offense of Escape from the State of Georgia."

This 1998 letter disclaiming the State of Georgia had any interest in extraditing this fugitive appeared to be the end of that problem in Walton's life. But that year he also learned he had a worse problem—he had contracted AIDS.

Then in April 2001, the unlucky Walton was stopped again on a minor traffic infraction, this time for riding a bike at dusk without a light. The officers found the fugitive warrant was still outstanding and, once again, contacted the Georgia authorities and held Walton in jail. This time Georgia changed its mind and lodged an extradition request with the California Governor's Office.

In May 2001, Judge Henry Barela released Walton from jail on $1,500 bond in order to allow him and his counsel to challenge the extradition. For some reason, Walton's counsel failed to request a Governor's hearing and on July 3, 2001, Governor Davis signed an extradition order.

Walton's new counsel filed a habeas corpus petition on July 31, 2001, claiming Georgia's extradition request was inadequate on its face. Judge Dan Oki heard and denied this petition on August 3, 2001. On that date Judge Barela continued Walton's bail until September 7 and was informed by counsel a new habeas corpus petition would be filed.

On September 6, 2001, a third set of lawyers filed a new habeas corpus petition challenging the extradition order. This petition raised a new and

different ground based primarily on Walton's deteriorating and life-threatening physical condition. The petition contended the process of extradition and imprisonment "would subject Petitioner to a potential denial of life-sustaining medical care and life-endangering custodial conditions in a setting that is incompatible with his severely compromised immune system, thereby subjecting Petitioner to Cruel and Unusual punishment in violation of the Eighth Amendment. . . ."

Two affidavits supported the allegations in the habeas corpus petition. The affidavit of a physician, Ronald Jefferson, M.D., affiliated with Martin Luther King, Jr., County Hospital, reported Walton was one of his patients who has been under treatment since November 1998. Dr. Jefferson described this patient's condition and the consequences of imprisonment.

"Mr. Walton has full-blown Aids. The seriousness of an Aids patient is exemplified by what is known as the T-cell count. A normal person has a T-cell count of approximately 800 or above. The T-cells are the white corpuscles that give a person immunity from certain diseases. When this T-cell count is lower than 200, the body has [*sic*] is less able to fight off disease and infection. When the T-cell count falls below 200 the person has what is known as active full-blown Aids. When Mr. Walton first came to us his T-cell count was 2 and in my opinion he was very near death. I was amazed that he survived but with treatment and medication we managed to get his T-cell count up to 71 when it was last tested. Mr. Walton is still very seriously ill and we are attempting to raise his T-cell count if at all possible.

"Mr. Walton must be monitored on a regular basis and he must take his medication twice a day, which consist [*sic*] of a combination of various drugs known as a "cocktail." Sometimes these drugs have to be changed in order to be effective with a particular patient. These drugs are very expensive and cost in excess of $1500.00 per month.

"Unless Mr. Walton is monitored on a regular basis and takes his medication as prescribed, it is my opinion that his life expectancy is less than one year. Even with proper monitoring and medication, Mr. Walton has a very short life expectancy, in my opinion of no more than four to five years.

"In my medical opinion, it is very important that Mr. Walton continue to be treated by those who are familiar with his medical history and where he can get the kind of treatment that is afforded by the County of Los Angeles County Hospital. In our experience in treating Aids patients, it is far better to treat them on an out patient basis because it is less stressful to the patient. Patients under stress are less likely to respond to treatment. Therefore, any incarceration of this patient might have a devastating effect on his ability to survive."

The second affidavit was signed by Tamara Serwer, a staff attorney at the Southern Center for Human Rights located in Atlanta. In this position she monitors conditions of confinement in Georgia prisons and files lawsuits challenging unconstitutional conditions in these facilities. She reported the center received hundreds of complaints from Georgia prisoners, many of them claiming inadequate medical care.

"Based on my investigation of these complaints, my experience working with HIV-positive inmates, and my consultation with numerous medical doctors concerning these issues, I can testify to the following facts:

"A person with AIDS . . . is exposed to much higher risks in the Georgia Department of Corrections ('GDOC') than he would be if he remained in the community. There are numerous opportunities for a person transferred to the GDOC to miss doses of this life-sustaining medication—during the transfer itself, during the intake process at the prison, when transferred from one prison facility to another, and when the health providers at the prison simply err and fail to provide the mediation. We have received reports of each of these lapses occurring in the GDOC.

"A person with a highly compromised immune system is also exposed to significant risks due to the nature of a prison environment. For example, contagious air-borne illnesses, such as flu and pneumonia (and, of course, TB), are spread easily among prisoners, due to the closeness of their living quarters and in some instances, the inadequacy of the ventilation system. Blood-borne diseases such as hepatitis are also, unfortunately, easily spread among prisoners. All of these illnesses can be life-threatening or accelerate the progression of disease in someone with AIDS."

The day after Walton's new lawyers filed this habeas corpus petition Judge Oki heard and summarily denied it. On that same day, Judge Barela conducted a hearing on Walton's bail status. Representatives of the Georgia Department of Corrections appeared and objected to continued bail. They requested immediate custody so they could return Walton to Georgia. The judge denied this request and continued proceedings until October 22, 2001, to provide Walton an opportunity to seek further relief.

Despite the court's action, the Georgia representatives then sought to take custody of Walton. He collapsed. When Judge Barela learned of this attempt he admonished the Georgia officials that they were not to remove Walton from California.

This led to the habeas corpus petition now before this court.

I agree with my colleagues when they reject Walton's primary argument for relief—the claim the extradition process and subsequent imprisonment in Georgia will subject him to cruel and unusual punishment in violation of the Eighth Amendment. But I part company with them as to the second issue. Because of the extraordinary and egregious circumstances of this case, I conclude Walton was denied due process in the extradition process itself and, further find this justifies, indeed requires, California to deny extradition to Georgia.

II. *Since the United States Supreme Court Decision in Puerto Rico v. Branstad, in Ordinary Situations States No Longer Have Discretion to Deny Extradition Requests from Other States and Instead Have a Ministerial Duty to Grant Such Requests.*

Earlier I recounted the history of extradition law and practice in the United States. As pointed out there, the extradition activity surrounding petitioner Walton fell on both sides of the great divide—the 1987 Supreme Court decision in *Puerto Rico v. Branstad*.[13] Georgia made its first extradition request in 1975 when the law appeared to sanction the practice of governors exercising discretion to refuse extradition in certain cases, especially where they distrusted the treatment the defendant might receive in the other state. Operating within this legal regime, the California Governor's Office turned down Georgia's request in 1975 for that very reason—and Georgia understandably did not challenge that rejection.

The second time Walton presumably came to the attention of Georgia authorities—in 1986—also fell within the era of permissible gubernatorial discretion. Georgia understandably would have little reason to file a new extradition request with a state governor's office that had rejected its first such request. But the third and fourth opportunities—in 1995 and 1996— both fell well on the other side of the *Branstad* divide. By then it was clear California's Governor no longer possessed *discretion* to deny a valid extradition request from Georgia or any other state. As the Supreme Court emphasized in *Branstad*, "[T]he commands of the Extradition Clause are mandatory, and afford no discretion to the executive officers or courts of the asylum State."[14]

The nation's high court had earlier defined the limited inquiry a state or lower *court* is legally authorized to undertake when a *governor* has granted another state's extradition request.[15]

---

[13]*Puerto Rico v. Branstad, supra*, 483 U.S. 219.

[14]*Puerto Rico v. Branstad, supra*, 483 U.S. at page 227 [107 S.Ct. at page 2808].

[15]*Michigan v. Doran* (1978) 439 U.S. 282, 289 [99 S.Ct. 530, 535-536, 58 L.Ed.2d 521].

After *Branstad*, no longer can governors or courts deny an extradition request from another state because of concerns whether the defendant is guilty of the charged crime, whether the defendant will have or did have a fair trial in the demanding state, whether the defendant has been or will be mistreated by law enforcement or prison officials in the other state. What is *not* clear will be discussed in part IV of this dissent. May the so-called asylum state consider whether the demanding state has forfeited its constitutional right to extradition by violating the defendant's constitutional right to due process "fundamental fairness" through its conduct in the extradition process itself?

III. *California Lacks Authority to Deny Extradition Because of Eighth Amendment Concerns About Walton's Health During His Proposed Incarceration in Georgia.*

As recited earlier in this opinion, Walton's current habeas corpus petition relied primarily on a claim of cruel and unusual punishment in violation of the Eighth Amendment. He claims his health condition is so tenuous his extradition to Georgia and incarceration in that state's prison system would be tantamount to a death sentence and thus represent cruel and unusual punishment for the 30-year-old robbery conviction. He introduced a physician's declaration supporting a finding he has advanced AIDS and his condition is so precarious the stress of extradition and the unhealthful conditions in prison pose a serious threat to his survival. He also introduced a declaration from a prisoner advocate testifying to the many dangers AIDS patients, like Walton, faced in Georgia's prison system.

Harsh as it may seem, however, California courts have no reason to even inquire into the truth of these claims. Assuming a decision granting extradition would be tantamount to a death sentence and even assuming it would constitute cruel and unusual punishment, we lack the discretion to deny extradition for this reason. The United States Supreme Court resolved this question in *Sweeney v. Woodall*[16] and *Pacileo v. Walker*.[17]

Thus, it is well settled in Supreme Court jurisprudence—an asylum state has no business concerning itself with any threats to the health or survival of a prisoner due to his anticipated treatment in the requesting state. It is the courts of the demanding state—and only those courts—which have jurisdiction to consider any constitutional or legal claims the prisoner may suffer illness, injury or death if extradited to that state. Accordingly, petitioner Walton's Eighth Amendment claims must be addressed to the Georgia courts.

---

[16]*Sweeney v. Woodall* (1952) 344 U.S. 86 [73 S.Ct. 139, 97 L.Ed. 114].
[17]*Pacileo v. Walker* (1980) 449 U.S. 86 [101 S.Ct. 308, 66 L.Ed.2d 304].

This does not mean, however, that Walton's present precarious health condition cannot enter into the due process equation when considering whether Georgia's conduct in the extradition process this past quarter century has created an egregious situation where to grant that state's current request would deny Walton his due process right to "fundamental fairness" under the United States Constitution. I now turn to that different and larger question.

IV. *Georgia Forfeited Its Right to Demand the Ministerial Act of Granting Extradition by Its Behavior in the Extradition Process Which Violated Walton's Due Process Rights Under the United States Constitution.*

It is not yet settled by the United States Supreme Court whether the so-called asylum state is deprived of the opportunity to inquire whether the other state has *forfeited its right* to expect essentially automatic extradition because of its behavior in the extradition process itself. The authorities are legion supporting the proposition an asylum state may not refuse extradition because of concerns about what may happen to a defendant in the courts or prisons of the other state or questions about the defendant's guilt or innocence. As the United States Supreme Court observed recently, "In case after case we have held that claims relating to what actually happened in the demanding State, the law of the demanding State, and what may be expected to happen in the demanding State when the fugitive returns are issues that must be tried in the courts of that State, and not in those of the asylum State."[18]

A. *In Rare Circumstances, a State's Conduct in the Extradition Process May Deny a Defendant the "Fundamental Fairness" Guaranteed by the Due Process Clause of the United States Constitution.*

What appears to remain an open question is whether a state may, by its behavior in the extradition process itself, essentially forfeit the right to demand the asylum state extradite a given defendant. Or, to phrase it somewhat differently, can such behavior so violate the defendant's rights as to bar the asylum state from extraditing him or her to the state where the underlying offense was committed?

---

[18]*New Mexico ex rel. Ortiz v. Reed* (1998) 524 U.S. 151, 153 [118 S.Ct. 1860, 1861, 141 L.Ed.2d 131]. In this case the Supreme Court reversed a New Mexico Supreme Court decision denying extradition of an escaped parolee from Ohio. The New Mexico court based its decision on a finding Ohio authorities would revoke the petitioner's parole without due process and inflict physical harm when he was returned to prison. The Supreme Court admonished the New Mexico court for "permit[ing] the litigation of issues not open in the asylum State." (524 U.S. at p. 155 [118 S.Ct. at p. 1862].)

While this concern can be phrased in the language of laches, waiver, or estoppel it may have to rise to the level of fundamental fairness as embodied in constitutional due process in order to justify judicial interference with an extradition order.

This principle is best exemplified by a unanimous 1970 decision of the Illinois Supreme Court, *People ex rel. Bowman v. Woods.*[19] In that case, like this one, the governor had acceded to a request from another state, Alabama, for extradition of a convicted defendant who had escaped from prison—in that case, 18 years earlier in 1952. Also, as in this case, in the intervening years Illinois had arrested the defendant, twice in that case, and informed Alabama both times. (Here there were five such opportunities, before the one at issue in this case.) Again, as in this case, on those earlier occasions Alabama authorities either ignored the extradition opportunity or affirmatively indicated it was not interested in extraditing the escapee.[20] Finally, again as in this case, Alabama suddenly developed a great interest in extraditing the escaped defendant the final time he was arrested in Illinois.

As framed by the Illinois Supreme Court, "The issue before the court is whether Illinois will be a party to the extradition of Bowman after two prior proceedings and a delay of some 13 years after the first proceeding."[21] The Illinois high court then conceded "that normally the scope of inquiry in *habeas corpus* proceedings commenced to test the validity of extradition is limited to: '(1) whether the accused is the person named in the warrant; (2) whether he is substantially charged with a crime in the demanding State; (3) whether he is a fugitive from justice of the demanding State; (4) whether the papers are regular in form. . . .'"[22] Notably, these are the same four issues the United States Supreme Court declared to define the proper scope of an asylum state's inquiry in *Michigan v. Doran.*[23]

Having explicitly recognized the ordinary scope of an asylum state's review, the court shifted to the circumstances of the extradition process itself. "In this case there was an unexplained 13-year delay between the first extradition proceeding in 1955 and the last effort in 1968. During this period the State of Alabama knew of Bowman's presence in Illinois and twice refused to extradite him. . . . We believe that the extraordinary circumstances of this case require an application of the concept of fundamental fairness [citing earlier Illinois constitutional due process cases], . . .While

---

[19]*People ex rel. Bowman v. Woods* (1970) 46 Ill.2d 572 [264 N.E.2d 151].
[20]*People ex rel. Bowman v. Woods, supra,* 264 N.E.2d 151.
[21]*People ex rel. Bowman v. Woods, supra,* 264 N.E.2d at page 152.
[22]*People ex rel. Bowman v. Woods, supra,* 264 N.E.2d at page 152.
[23]*Michigan v. Doran, supra,* 439 U.S. at page 289 [99 S.Ct. at pages 535-536].

normally the mere passing of time will not discharge petitioner, at a certain point and after a certain number of incompleted extraditions, we must find that the State of *Alabama has forfeited its right to enforce extradition.*"[24]

In its briefing, the Attorney General's Office argues *People ex rel. Bowman v. Woods* is no longer valid authority even in Illinois, after the United States Supreme Court's decision in *Puerto Rico v. Branstad*—pointing to an Illinois appellate court opinion which raises that question.[25] At the same time, however, the Illinois Supreme Court itself has never retreated from the *Bowman* opinion, although admittedly it also has not as yet found another fact situation in the extradition context presenting such "extraordinary circumstances" as to "require an application of the concept of fundamental fairness." Moreover, other Illinois Courts of Appeal have treated *Bowman* as remaining good law after *Branstad*, but again have not yet found the cases before them to present the required "extraordinary circumstances."[26]

In any event, we cite *People ex rel. Bowman v. Woods* for its reasoning, not its precedential value.[27] Under the United States Constitution, a state may have a ministerial duty to honor another state's legitimate request to extradite one of its residents to face charges or imprisonment in the other state. And that state may have to do so without regard to its own appraisal of whether its resident will be treated fairly in the other state's courts and

---

[24]*People ex rel. Bowman v. Woods, supra,* 264 N.E.2d at pages 152-153, italics added, citations omitted.

[25]*People v. Martin* (1991) 208 Ill.App.3d 857 [153 Ill.Dec. 870, 567 N.E.2d 1097, 1100].

[26]*Cohen v. Sheahan* (1998) 298 Ill.App.3d 961 [233 Ill.Dec. 414, 700 N.E.2d 1122, 1127] (In refusing to consider defendant's due process claim the requesting state reneged on a plea deal, the Illinois court distinguished between those constitutional claims which only the requesting state may adjudicate and those involving the extradition process itself which the asylum state may consider.) "Challenges addressing the merits of the charges against the accused are outside the scope of our review. [Citation.] . . . Illinois courts have denied extradition based on a violation of fundamental fairness only 'where there as been an inordinate delay in the demanding State seeking extradition that is not attributed to the accused' " (quoting *Bowman v. Woods,* and *Beauchamp v. Elrod* (1985) 137 Ill.App.3d 208 [92 Ill.Dec 86, 484 N.E.2d 817]). See also *People v. Shockley* (1987) 152 Ill.App.3d 38 [105 Ill.Dec 240, 504 N.E.2d 109, 111] ("The issue of due process is addressed by the court in its review of extradition proceedings where there has been an inordinate delay. (See *People ex rel. Bowman v. Woods*[, *supra*] . . . (where a 13-year delay between the demand for petitioner's extradition and a warrant for rendition, petitioner's request for *habeas corpus* was granted)). Here, any such delay, if it existed, was caused by petitioner's continued objections to the extradition request process.").

[27]Other jurisdictions have recognized a state can forfeit its right to reincarcerate an escapee. See, e.g., *State v. Chapman* (Tenn.Crim.App. 1997) 977 S.W.2d 122, 126 (due process might prevent reincarceration when it would be "fundamentally unfair" due to the government's actions but only if those actions were " 'so affirmatively improper or grossly negligent that it would be unequivocally inconsistent with "fundamental principles of liberty and justice" to require a legal sentence to be served in the aftermath' ").

prison system. But do not defendants have a right to due process in the extradition process itself? And do not states have a right to ensure other states adhere to due process in that extradition process? And is it not possible for the other state to forfeit its constitutional right to demand the asylum state comply with the ministerial duty to extradite a defendant by engaging in intentional or negligent conduct during the extradition process that deprives that defendant of his or her constitutional rights to due process? If the circumstances are sufficiently "extraordinary," I conclude the answer to these questions is yes, and furthermore conclude the circumstances of this case are too "extraordinary" and "egregious" as to justify denial of extradition in this case.

Here, as in *Bowman*, we have "extraordinary circumstances" denying a fugitive "fundamental fairness" under the due process clause. In *Bowman* it was 18 *years* between the petitioner's escape and the final request for extradition. Here *30 years* elapsed between the day the 19-year-old Walton joined a prison break and the 49-year-old Walton faced Georgia's extradition request. In *Bowman* it was *13 years* from Alabama's first extradition opportunity and the final request. Here it was over *a quarter century* from the first to the last. In *Bowman* there had been two prior opportunities for the other state to seek extradition from Illinois. Here Georgia had five such previous opportunities, although admittedly in the first one it was thwarted by California's then apparently lawful refusal to comply with its extradition request. In *Bowman* the other state had once failed to follow through when Illinois granted an extradition request. Here Georgia wrote to California and expressly advised it was not interested in extraditing Walton.

The Attorney General cites to a Second Circuit Court of Appeals case, *Strachan v. Colon*,[28] which held a *40-year* delay in seeking extradition of a suspect in a murder case did not warrant denial of the state's extradition request. That case is readily distinguishable, however. It involved the murder of a Miami police officer in 1944. The petitioner in the extradition proceeding had left Florida for New York the next day. He settled there and lived a quiet life for the next 44 years. Meanwhile, back in Florida the murder investigation meandered along. True, investigators viewed the petitioner as a potential suspect, almost from the beginning, and knew he was residing in New York. But they lacked enough evidence to obtain an arrest warrant for over 40 years. Consequently, unlike the instant case, Florida had no legal basis to seek extradition during those years. Nor did New York authorities ever arrest the defendant in that case for any crime or traffic violation and thus trigger an extradition warrant had it existed. Only when a new witness stepped forward in 1989 did Florida have a case against the petitioner, obtain an arrest warrant, and almost immediately seek his extradition.

---

[28]*Strachan v. Colon* (2d Cir. 1991) 941 F.2d 128.

In his challenge to extradition, the petitioner in *Strachan* raised what the Second Circuit characterized as an issue of first impression, the defense of laches. But the petitioner based this claim on delay in the *investigation* of this crime, not delay in seeking *extradition* once the investigation yielded an arrest warrant. The Second Circuit appropriately viewed laches as a potential defense to the murder charge in Florida, not a potential defect in the extradition process itself.[29] Thus, it had no occasion to address the issue raised in *Bowman* or in the instant case. Here, unlike *Strachan*, a legal process warranting Walton's immediate extradition existed for the entire period of delay in seeking extradition. Here, unlike *Strachan*, the demanding state had several opportunities to seek extradition during those years. And here, unlike *Strachan*, the demanding state expressly waived one opportunity to pursue extradition.

On balance, I find this a compelling case of "extraordinary circumstances" justifying a finding Georgia denied Walton due process in the extradition process itself. Whether Georgia's actions and inactions were intentional or negligent is irrelevant. Thus, this is unlike an asylum state's court attempting to make judgments about whether the petitioner actually committed the alleged crime in the demanding state, or what happened at the trial in that state, or whether the prisons in that state will treat the petitioner fairly. As the Supreme Court has held repeatedly, all these are questions better answered in the courts of the demanding state where all these events occurred and all these institutions exist. But when it comes to the demanding state's behavior in pursuing extradition from the asylum state, this is an issue properly decided by the asylum state. Those actions or lack of action took place in the asylum state or in communications with that state. Applying an objective standard, the asylum state is in a position to judge the appropriateness and constitutionality of what the demanding state did or did not do in seeking petitioner's extradition. Only when that behavior descends to the level it presents "extraordinary circumstances" denying the petitioner "fundamental fairness" is a court in the asylum state justified in denying extradition. But it is the appropriate venue for that inquiry.

Because the circumstance must indeed be so extraordinary, my research has been unable to locate a case other than *Bowman* where an appellate court

---

[29]"To make an exception and permit the defense of laches to be examined in an asylum state would defeat [the] express purposes of the Extradition Clause, and would be no less inappropriate than to decide whether the indicting state had probable cause to issue a warrant for petitioner's arrest. [Citation.]

". . . Case law strongly suggests that however compelling a prisoner's defense, it may not form the basis for a denial of extradition, either by the asylum state or by a reviewing court. *See California v. Superior Court [of California* (1987)] 482 U.S. [400, 407-408 [107 S.Ct. 2433, 2438-2439, 96 L.Ed. 332]] (extradition proceedings are ' "emphatically" ' not the appropriate time or place for entertaining defenses or determining the guilt or innocence of the charged party. . . .)" (*Strachan v. Colon, supra*, 941 F.2d 128, 131.)

has denied an extradition request based on the requesting state's egregious behavior in the extradition process itself.[30] But there is a close analogy available, one which suggests the standards to be applied in such cases. That is found in a convicted defendant's due process right not to be subject to egregious delay in the incarceration—or sometimes the reincarceration—process.

B. *Convicted Defendants Have Federal Due Process Rights Not to Be Reincarcerated After Egregious or Unduly Lengthy Delays After Their Convictions or Release from Custody and Similar Principles and Standards Should Apply When Extradition Is Sought for the Purpose of Reincarcerating a Convicted Defendant.*

In the case before this court the defendant was convicted in one state and 30 years later that state seeks to extradite him from another state for the purpose of reincarcerating him in the first state. But what about when a state delays many years after a defendant is convicted and while he is still in that state finally seeks to execute his sentence by incarcerating him? Or when an imprisoned defendant is mistakenly released and through the state's negligence remains free for a long period within that same state before the state finally seeks to reincarcerate him? Several federal circuit court cases and some state appellate courts have dealt with this situation and occasionally found the circumstances can be so egregious as to deny the convicted defendant his due process rights to "fundamental fairness" under the United States Constitution. If so, the state forfeits its right to incarcerate—or more often to reincarcerate—its own citizen. The question then arises: if this is true for a state's own citizens, why should it be any different for the citizens of other states it seeks to extradite for this same purpose?

This constitutional right modifies the traditional common law rule, which broached no exceptions. "[W]here the court's judgment is that the defendant be imprisoned for a certain term and for any reason, other than death or remission of sentence, time elapses without the imprisonment being endured, the sentence remains valid and subsisting in its entirety."[31] As far back as 1902, federal courts began chipping away at the blanket common law rule.

---

[30]There is, however, at least one federal circuit court opinion that applied these due process considerations to an extradition case seeking return of an escaped convict. *Mathes v. Pierpont* (8th Cir. 1984) 725 F.2d 77. Although the Eighth Circuit Court of Appeals found the facts were insufficiently egregious in that case to warrant an order prohibiting extradition, the legal principle it endorsed would lead to that result in the case before this court. See discussion of *Mathes* at pages 966-967, *post.*

[31]*United States v. Vann* (E.D.N.Y. 1962) 207 F.Supp. 108, 113.

In that year, a federal circuit court in Missouri held an undue delay in execution of a sentence could be "repugnant to the law."[32]

But it was 1967 which brought the beginnings of an articulated due process rationale for this position in the context of reincarceration of a former prisoner. In *Shields v. Beto*,[33] the Fifth Circuit Court of Appeals considered a habeas corpus petition from a Texas defendant who had been convicted 30 years earlier in that state and received a 40-year sentence. A year into that sentence he was extradited to another state to finish serving a sentence for a prior crime. Twenty-eight years after his extradition and 18 years after completing the sentence in the other state he was convicted in Texas of a new crime. The Texas judge sought to add the 39 years of unserved time for the initial crime to the two-year sentence for the new, lesser crime. The Fifth Circuit framed the issue as "whether after more than 28 years of inaction on the part of the State of Texas relative to the unexpired term of Shields's 1933 convictions, he may now on conviction of a new felony in Texas be required to serve the balance of time on these old sentences. Do the circumstances of this case, therefore, offend the constitutional precepts of due process stated in the Fourteenth Amendment?"[34] The Fifth Circuit's answer to the latter question was a definitive "yes."[35]

The Fifth Circuit first made an observation equally relevant to the case before this court. "The due process clause of the Fourteenth Amendment requires that action by a state through any of its agencies must be consistent with the fundamental principles of liberty and justice. . . . It exacts from the states a conception of fundamental justice. . . ."[36] Later the court held " ' "the acts of many officials other than the Governor may bind the State.

---

[32]*In re Jennings* (C.C.E.D.Mo. 1902) 118 Fed. 479.

[33]*Shields v. Beto* (5th Cir. 1967) 370 F.2d 1003.

[34]*Shields v. Beto, supra*, 370 F.2d at page 1004.

[35]It is interesting to observe how easily this case could have been one involving an identical due process issue, but in the context of an unduly delayed extradition request. Imagine the new crime had not taken place in Texas but in another state. Upon receiving notice of the defendant's location in that other state, Texas immediately files an extradition request with that state, seeking return of the defendant to complete serving out the remaining 39 years of his initial 40-year sentence. Substitute the name of the "asylum" state for Texas in the Fifth Circuit's description of the issue in *Shields v. Beto*, and it reads the same, that is, "whether after more than 28 years of inaction on the part of the State of Texas relative to the unexpired term of Shields's 1933 convictions, he may now on conviction of a new felony in [the asylum state] be required to serve the balance of time on these old sentences." If the 28 years of inaction was enough to violate due process and forfeit Texas's right to reincarcerate a previously convicted defendant they located in Texas, why is that same 28 years of inaction not enough to violate due process when Texas seeks to extradite and reincarcerate someone now located in another state?

[36]*Shields v. Beto, supra*, 370 F.2d at page 1004, citations omitted.

And if the Governor may waive a right of the State when he is not attempting to exercise his right to pardon and is acting in another field, we see no reason why other officials of the State should not also bind the State by their official acts." ' "[37] Consequently, "[t]he lack of interest in Shields by the State of Texas from the date he was released to the Louisiana authorities . . . a lapse of more than 28 years, was equivalent to a pardon or commutation of his sentence and a waiver of jurisdiction."[38]

In a subsequent case, *Mathes v. Pierpont*,[39] the Eighth Circuit characterized *Shields v. Beto* as having developed a "waiver theory" for determining whether due process is violated by a state's belated attempt to incarcerate or reincarcerate a convicted defendant. "Distilled to its essence, the theory provides that in order to establish waiver, *** it is not sufficient to prove official conduct that merely evidences a lack of eager pursuit or even arguable lack of interest. Rather the waiving state's action must be so affirmatively wrong or its inaction so grossly negligent that it would be unequivocally inconsistent with 'fundamental principles of liberty and justice' to require a legal sentence to be served in the aftermath of such action or inaction."[40]

Significantly, *Mathes v. Pierpont* itself is an extradition case. Indeed like Walton the convicted defendant there was an escapee from the requesting state's prison system. Yet the Eighth Circuit considered *Shields v. Beto* and the other incarceration-reincarceration cases to be determinative of whether to enforce extradition or grant the defendant's habeas corpus petition and order his release. In *Mathes*, Oklahoma had obtained an extradition warrant from the Missouri Governor to return this escapee so he could complete his term. From the time of his escape until issuance of the extradition warrant, the defendant had been in and out of federal and state prisons and between terms living in other states, only spending a few days back in Oklahoma during this period.

While *Shields v. Beto* had involved the prison officials' negligent release of a defendant to another state's prison system rather than the defendant's escape, the *Mathes* court did not rely on this as the primary grounds for distinguishing the *Shields* holding. Rather it looked to the length and other circumstances of the requesting state's inactivity in seeking to enforce the

---

[37]*Shields v. Beto, supra,* 370 F.2d at page 1005.
[38]*Shields v. Beto, supra,* 370 F.2d at page 1006.
[39]*Mathes v. Pierpont, supra,* 725 F.2d 77.
[40]*Mathes v. Pierpont, supra,* 725 F.2d at pages 78-79, citing as further authority *Piper v. Estelle* (5th Cir. 1973) 485 F.2d 245, 246.

defendant's reincarceration. "This case is readily distinguished from that of *Shields v. Beto*, 370 F.2d 1003[, *supra*]. In *Shields*, the court found that the failure of Texas to take any affirmative action to reacquire jurisdiction over a prisoner it had released to Louisiana authorities for a period of 28 years was equivalent to a pardon. Instead, we find that this case is more closely analogous to *Piper v. Estelle*, 485 F.2d 245 [, *supra*], where a 22-month delay in lodging a detainer presented no federal constitutional basis for voiding a prior sentence. While we acknowledge that the seven-year delay in this case is considerably longer than that present in *Piper v. Estelle*, we find that it does not rise to the level of gross negligence present in *Shields v. Beto*."[41]

But what if the facts of *Mathes v. Pierpont* had been as egregious as *Shields v. Beto*—or as the case before this court. Presumably the Eighth Circuit would have granted this escapee from Oklahoma justice habeas corpus relief so he would not be extradited to that state to serve the remainder of his sentence. In that sense, *Mathes v. Pierpont* represents at least dictum in support of the *Bowman* rationale, supplying a link between the straight delayed reincarceration cases involving a single state and those involving extradition from one state to another for purposes of reincarceration.

The Ninth Circuit Court of Appeals also has weighed in on this question. In *Johnson v. Williford*,[42] a federal criminal case, the government sought to reincarcerate a narcotics defendant the authorities erroneously paroled three years into a minimum 10-year, without possibility of parole, sentence. The Ninth Circuit affirmed the district court's order granting the defendant habeas corpus prohibiting the defendant's reincarceration. It based this decision on two independent and sufficient grounds—equitable estoppel of the government and violation of the defendant's due process rights.

The *Johnson* court found estoppel against the government appropriate in that case because "the government's wrongful conduct [threatened] to 'work a serious injustice' and the public' interest [was not] '. . . unduly damaged by the imposition of estoppel.' "[43] The defendant's continued freedom did not threaten the public interest because of the parole commission's "deliberate decision to release Johnson on parole, and his subsequent successful

---

[41]*Mathes v. Pierpont, supra*, 725 F.2d at page 79.

[42]*Johnson v. Williford, supra*, 682 F.2d 868.

[43]*Johnson v. Williford, supra*, 682 F.2d at page 871, quoting the test from *United States v. Lazy FC Ranch* (9th Cir. 1973) 481 F.2d 985, 989 [27 A.L.R.Fed. 694].

reintegration into the community. . . ."[44] Meanwhile, as to the requirement of a "serious injustice," the court pointed to ". . . 15 months of parole release surely justified him in expecting to continue, during good behavior, in that status. The frustration of those expectations would be a serious injustice."[45]

Before turning to the alternate grounds for the Ninth Circuit's *Johnson*, decision—the denial of this convicted defendant's due process rights—I note the "equitable estoppel" rationale[46] used in this straight reincarceration case supports Walton's position in his "extradition to re-incarcerate" case. In the *Johnson* case, the parole authorities' error in treating the defendant's nonparolable offense as parolable was considered to satisfy the required element, "the party to be estopped must know the facts." Those authorities had always known that defendant had been convicted of a crime which carried a sentence "without possibility of parole." "[T]he government can hardly deny knowledge of what it has always treated as settled law." In Walton's case, the Attorney General submitted documents suggesting Georgia authorities may have erroneously believed California's 1975 rejection of Georgia's initial extradition request legally precluded that state from lodging a new request based on the same crime. To the extent this claim is true, it too satisfies the first element of equitable estoppel. In both cases, the government knew the true facts but through a mistake of fact or law acted in an erroneous fashion which misled a convicted defendant to believe he was now a free man.

The remaining elements of estoppel against the government are more easily satisfied by Walton's case than the situation the Ninth Circuit describes in *Johnson*. In *Johnson*, the party asserting estoppel "surely had a right to believe, . . . after . . . his ultimate release on parole for a period of 15 months, that he would remain on parole during good behavior." Here, Walton was free for a quarter century and on several occasions his presence and location brought to the attention of Georgia authorities, leading to a reasonable expectation he would remain free from reincarceration on the 1972 Georgia conviction.

As to the third element, the convicted defendant's ignorance of the true situation, the *Johnson* court held the defendant could not be charged with

---

[44]*Johnson v. Williford, supra*, 682 F.2d at page 871.

[45]*Johnson v. Williford, supra*, 682 F.2d at page 872.

[46]The *Johnson* court listed the elements of estoppel as (1) the party to be estopped must know the facts; (2) must intend his conduct shall be acted on or must so act the party asserting estoppel has a right to believe it is so intended; (3) the party asserting estoppel must be ignorant of the facts; (4) the party asserting estoppel must rely on the other party's conduct to its injury. (See *Johnson v. Williford, supra*, 682 F.2d at p. 872.)

"constructive knowledge" of the proper legal interpretation of the sentencing structure for the crime of which he was committed, especially when the government has misinterpreted that provision itself. Even more clearly, Walton cannot be charged with "constructive knowledge" the Georgia authorities were mistaken in their interpretation of extradition law and had refrained for nearly a quarter century from seeking his reincarceration solely because of that error (assuming this was the reason for their long period of inactivity in his case).

The fourth and final element of equitable estoppel is detrimental reliance by the person asserting estoppel. In *Johnson,* the Ninth Circuit found this element satisfied by the convicted defendant's reunification with his family and pursuit of a new business enterprise during the 15 months he had been free on parole. Here, Walton has been free for nearly 30 years, started and raised a family, worked for nearly 30 years, and now has a terminal illness where proper care is facilitated by and perhaps dependent on his continued freedom.

The due process rationale the *Johnson* court employed as an alternate justification for its decision has even more relevance to Watson's case. In doing so, the Ninth Circuit expanded on the reasoning set forth in a district court case a few years earlier, *United States v. Merritt.*[47] In that case, the court ruled it would be inconsistent with "fundamental principles of liberty and justice" to reincarcerate a prisoner who had been erroneously released on parole three years earlier because the authorities mistakenly ignored a federal detainer when the defendant completed his state sentence. Both the *Merritt* and *Johnson* courts emphasized two factors in their "due process" equation—the government's behavior, which must constitute "affirmatively wrong" action or "grossly negligent" inaction, and the defendant's behavior while he has been free, which must represent a "good adjustment."[48] As the *Merritt* court concluded, "[a]n order requiring service of defendant's sentence now would needlessly jeopardize his long-term adjustment to society, disrupt both his family and his family life, and destroy his economic base, all for no purpose other than to secure blind obedience to the 1973 sentence as it was then imposed."[49] The same could be said about an order extraditing Walton to serve out the term of his 1972 sentence in Georgia, except one could also add to the litany of adverse consequences, "to the probable great detriment of his precarious health condition and possibly his very survival."

[47]*United States v. Merritt* (D.D.C. 1979) 478 F.Supp. 804.
[48]*Johnson v. Williford, supra,* 682 F.2d. at page 873.
[49]*United States v. Merritt, supra,* 478 F.Supp. at page 808, footnotes omitted.

*V. The Power and Responsibility the Constitution Confers on the Governor to Comply with Requests from Other States to Extradite Persons Charged or Convicted of Crimes in Those Other States Are No More Absolute Than Any Other Power or Duty Conferred by the Constitution and Like Them Is Subject to the Due Process and Other Constitutional Rights the Bill of Rights Gives to Individual Citizens, Including Those Charged or Convicted of Criminal Offenses.*

I have left to the last what seems an obvious point, but one which conceivably may be overlooked because of the United States Supreme Court's emphasis on the summary and mandatory nature of the extradition power conferred in United States Constitution, article IV, section 2, clause 2. The point also may be obscured because governors and courts thus far have consistently sought to reject extradition requests for all the wrong reasons, usually because they did not trust the judiciaries or prisons in the state seeking extradition. The point? The extradition power is, like every other power the Constitution confers on government, subject to the Bill of Rights and the protections this bulwark against governmental excess grants individual citizens. That power, like every other governmental power, must be exercised in a manner consistent with due process and other constitutional protections individual citizens enjoy.

This is not to suggest the asylum state is authorized to inquire whether the requesting state will honor the defendant's constitutional rights after he is extradited to that state. The extradition power is a narrow and precise power as described in the Constitution and it is only the defendant's due process rights in the government's exercise of that power the asylum state properly tests during the extradition process. But when a state seeks extradition of a defendant, despite engaging in "affirmatively wrong" action or "grossly negligent" inaction in its exercise of the extradition power itself, the courts of the asylum state are well within their rights in determining whether in those circumstances extradition would violate the defendant's due process rights. This is especially true when the requesting state is seeking extradition for purposes of reincarcerating a convicted defendant to serve out the remainder of his term. If it would be a federal due process violation for that state to reincarcerate the defendant because of its own actions or inactions, then it should be a due process violation to request or order extradition for that purpose.

A final word about the proper forum for resolving these issues about the constitutionality of a given exercise of the extradition power. In my view, those questions, and only those questions, are properly resolved by the courts of the asylum state. By conferring on one state governor the *power* to

request and on another the *duty* to grant extradition, the Constitution cannot be read to have also conferred on these executives the *exclusive jurisdiction* to determine whether these officials exercised that power and complied with that duty consistent with the individual defendant's right to due process and the other protections of the Bill of Rights. Justice John Marshall would roll over in his grave at the very notion.

This court is not only the proper forum to consider these issues, but for reasons explored above, should grant Walton's habeas corpus petition. The facts of this case cry out for relief from what is so clearly an unconstitutional extradition. Had Walton remained in Georgia the past 30 years under the same circumstances as exist here, Georgia would have forfeited its right to reincarcerate him under constitutional principles discussed in cases like *Johnson v. Williford, Shields v. Beto,* and *Mathes v. Pierpont,* all discussed in the previous part.

Even setting the reincarceration cases aside, Georgia's behavior in the extradition process at least after 1975—both its actions and its inaction— was so grossly negligent and the consequences for Walton so serious as to constitute a violation of the "fundamental principles of liberty and justice" guaranteed by the due process clause of the United States Constitution. As the Ninth Circuit has held, "[e]ven convicted criminals are entitled to be treated by their government in a fair and straightforward manner."[50] Here, the length of time the state waited to lodge its second extradition request, a quarter century, was alone powerful evidence of gross negligence. The fact California apprised Georgia of Walton's presence several times during that quarter century without eliciting a request for extradition further supports a finding of gross negligence.

If Georgia's failure to act sooner reflected deliberate indifference or a conscious choice to allow Walton to continue making a new life in California, Georgia's conduct also would constitute "affirmatively wrong" actions. Conversely, if the failure to seek extradition flowed, as the Attorney General's submission suggests, from Georgia's mistaken interpretation of extradition law—the belief it could not lodge a second request because of California's rejection of its first request—this would represent another example of "gross negligence." Whatever the motivation or reason, Georgia delayed an unconscionable length of time to renew its request for extradition, to the great detriment of Walton and violation of his due process rights to "fundamental principles of liberty and justice" and "fair treatment" by the government of Georgia.

To compound its quarter century of inaction, in 1998 Georgia also took the affirmative step of sending a letter advising California it did not want to

---

[50]*Johnson v. Williford, supra,* 682 F.2d at page 872.

extradite Walton. The Attorney General seeks to make much of the letter's language stating the state has no interest in extraditing him for the "escape" from prison, with no specific mention of the robbery offense. But the same letter reflects the Georgia authorities had information about this earlier conviction in their possession as well as the failed attempt to extradite Walton in 1975. Yet once again and with all that information Georgia expressly chose not to seek Walton's extradition for either that offense or his escape from the resulting incarceration. If that is not technically an express waiver of the state's right to extradite Walton for purposes of reincarcerating him for the robbery conviction, it certainly qualifies as the sort of "affirmative wrong" or "grossly negligent" inaction which is the basis for a finding "under the totality of the circumstances" that Georgia's behavior violated due process.

To further support a finding Georgia violated "fundamental principles of liberty and justice" consider what this inordinate delay means to this defendant. Over time, the state's conduct led him to believe California's initial rejection of extradition was the final word on the subject. He built a life in our state—had children, grandchildren, a job, and a home. Now, "all for no purpose other than to secure blind obedience to the [1972] sentence as it was then imposed" this entire life is to be upset, and because of his deteriorating health, his physical condition and perhaps survival placed in jeopardy.

As the personal costs Walton faces through reincarceration have grown during this lengthy period of inaction on the extradition front, the benefits Georgia might gain from returning him to prison have diminished to near zero. Walton has not proven himself to be a serious threat to society over the past 30 years. So neither incapacitation nor rehabilitation remains relevant justification for his reincarceration. And, it is difficult to even imagine how his reincarceration so many years later and in his present physical condition could deter anyone else from committing a crime. This leaves nothing but naked retribution as a reason for extraditing Walton to serve out the remainder of his 30-year-old sentence. I question whether this dubious social value can justify depriving Walton of the freedom and repose Georgia's gross negligence led him to expect nor to deny him his due process rights to "liberty and justice" as well as "fair treatment" by government.

I hasten to add the circumstances of this case are extraordinary—and thus rare. I doubt very many defendants, if any, will succeed in avoiding extradition as a result of a principle allowing California to consider whether a demanding state's behavior in seeking extradition has been so egregiously dilatory as to deny the defendant the fundamental fairness guaranteed by the due process clause. To justify a state's rejection of another state's extradition

request under the principles argued in this dissent requires the asylum state to find the demanding state allowed the passage of decades after the defendant fled its jurisdiction, the deliberate or negligent failure to take advantage of extradition opportunities during those decades, and a defendant who has not been incarcerated in the asylum state or another jurisdiction for most of the intervening period. (The latter is a relevant factor because the demanding state has little incentive to seek extradition of someone imprisoned in another state, even if that imprisonment lasts for several decades, unless and until that incarceration is scheduled to end.)

I conclude Georgia's behavior in the extradition process here qualified as one of those rare instances of "extraordinary circumstances" depriving this petitioner of "fundamental fairness" guaranteed by due process. Accordingly, I would hold Georgia has forfeited its right to demand Walton's extradition to that state to serve the remaining sentence for a 30-year-old crime, or at least as much of that remaining sentence as he might survive to serve.

My colleagues are not persuaded by these same considerations, but I am pleased to observe the stay will remain in effect for a period sufficient to allow counsel time to seek further relief in the California Supreme Court and/or the federal courts. The propriety of an extradition should be decided before the extradition happens, not afterwards. If there is any lingering doubt whether the state courts of the asylum state are a proper forum for resolving constitutional questions arising in the extradition process itself, no one can quarrel with a United States District Court or Circuit Court located in the asylum state undertaking to consider such claims and doing so before extradition has occurred.

A petition for a rehearing was denied July 11, 2002, and the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied September 11, 2002. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.